### MURPHY *v.* GIFFORD.

1. SALES—TRIAL—CONTRACTS—RESCISSION QUESTION FOR JURY.
   In an action for the balance due on a contract for the purchase of a typesetting machine, conflicting testimony as to whether defendant had rescinded said contract as claimed by him and denied by plaintiff, *held*, to present an issue of fact for the jury.[1]

[1]Sales, 35 Cyc. p. 574.
On exclusiveness of remedy for breach of warranty provided in contract for sale of machinery, see note in 50 L. R. A. (N. S.) 753.
As to whether express warranty as to quality excludes implied warranty as to quality, see comprehensive note in 33 L. R. A. (N. S.) 501.

2. SAME—EVIDENCE—BURDEN OF PROOF.

Where defendant claimed to have rescinded a contract upon which he was sued, which was denied by plaintiff, the burden of proof rested upon defendant.[2]

3. SAME—INSTRUCTIONS—RESCISSION—NOTICE.

Where the issue of whether or not defendant had given notice of his rescission of the contract was for the jury, plaintiff was entitled to have them properly instructed in regard thereto by giving them plaintiff's requests for instruction thereon or their substance.[3]

4. SAME—EVIDENCE—ESTOPPEL—LACHES.

Defendant's letters to the seller of the machine, in which he stated that he was well satisfied with it, together with his testimony, held, to take to the jury the question of his estoppel to rescind by delay and laches, as requested by plaintiff.[4]

5. SAME—DUTY TO INSPECT—RESCISSION—NOTICE.

It was defendant's duty, under the circumstances shown, to fully inspect and test the machine after it had been installed and turned over to him, within a reasonable time, and if he had reason, and desired to rescind, to thereafter promptly give notice thereof to the seller.[5]

6. EVIDENCE—CONTRACTS—PAROL EVIDENCE.

Where the written contract contained no doubtful or obscure provisions, parol evidence in aid of its construction was not admissible.[6]

7. SAME — ORAL TESTIMONY ADMISSIBLE TO SHOW FRAUDULENT REPRESENTATIONS.

Where defendant claimed that he had been induced to enter into said contract by reason of the false and fraudulent representations of the seller's agent, oral testimony on that issue was admissible only to show that the contract was void or voidable at defendant's option because of said fraud and deceit whereby he was induced to enter into it.[7]

8. SALES—GUARANTY—WRITTEN GUARANTY PRECLUDES IMPLIED ONE.

Where there is a written contract containing an express warranty, no other or different one may be inferred.[8]

[2]Sales, 35 Cyc. p. 566; [3]Id., 35 Cyc. p. 577; [4]Id., 35 Cyc. p. 574; [5]Id., 35 Cyc. pp. 151, 227, 229; [6]Evidence, 22 C. J. § 1570; [7]Id., 22 C. J. § 1626; [8]Sales, 35 Cyc. p. 392.

9. SAME—TRIAL—ORAL REPRESENTATIONS INDUCING CONTRACT NOT GUARANTIES.

> Where the written contract contained express warranties, the trial court was in error in allowing the jury to infer implied warranties from oral testimony as to alleged false representations claimed to have been made before the contract was entered into.[9]

10. SAME—WORDS AND PHRASES—"REPRESENTATIONS" DEFINED.

> Representations are precursors to a contract and do not enter into it; their purpose being accomplished when the contract is made.[10]

11. SAME—"GUARANTY" DEFINED.

> A guaranty or warranty is a matter of contract, a part of the contract itself upon which the minds of the parties meet, and cannot exist without it.[11]

12. SAME—TRIAL—INSTRUCTIONS.

> Failure of the trial court to instruct the jury in plain terms as to the distinction between a representation which precedes but is not an element of the contract, and a guaranty which necessarily becomes a part of the contract, *held,* reversible error.[12]

Error to Eaton; Smith (Clement), J. Submitted January 10, 1924. (Docket No. 49.) Decided October 6, 1924.

Assumpsit by Anne M. Murphy against R. D. Gifford on a contract for the sale of certain machinery. Judgment for defendant. Plaintiff brings error. Reversed.

*Rosslyn L. Sowers,* for appellant.

*Peters & Marshall,* for appellee.

STEERE, J. Plaintiff, as assignee, brought this action in the Eaton county circuit court to recover from defendant Gifford an unpaid balance claimed due

---

[9]Sales, 35 Cyc. p. 368; [10]Id., 35 Cyc. p. 368; [11]Id., 35 Cyc. p. 368; [12]Id., 35 Cyc. p. 576.

on a typesetting machine sold him by the American Typograph Company, of Detroit, Michigan, under a contract with deferred payments. Plaintiff declared in assumpsit for the balance due on the contract, set out in full, and defendant pleaded the general issue with a lengthy notice of special defense, the material substance of which, as amended, is that he was induced to enter into the contract by fraudulent and false representations, "that said machine was suitable for job work, and that said machine would do all kinds and grades of work that any typesetting or slug-casting machine would do," and that in his unsuccessful efforts to use said machine he suffered serious losses in time and money for which damages were claimed by way of set-off and recoupment.

The case was tried before a jury, resulting in a verdict and judgment in defendant's favor, under his counterclaim of recoupment, amounting to $299.97. Plaintiff's counsel moved the court to set aside the verdict and grant a new trial, which was denied, and the case was then removed to this court for review on assigned errors. Those especially urged here, as stated in the brief of plaintiff's counsel, are directed to the charge of the court and refusal to give certain of plaintiff's requests.

The American Typograph Company manufactured and sold to the trade a slug-casting, one-face typesetting machine called the Improved Typograph. Gifford printed and published a newspaper called the Review at the city of Eaton Rapids, Michigan, and on September 1, 1913, wrote the Typograph Company as follows:

"*Gentlemen:* Please inform me what the Typograph costs, also best possible terms you give. Am thinking of buying some kind of a machine.
"Very truly,
"R. D. GIFFORD."

In reply the company sent him, on September 2,

1913, some circular matter relating to the Typograph, copies of some papers from offices where it was in use showing different kinds of type, and wrote him a letter with statement of price, terms, etc., saying in part:

"The Typograph is a line-casting machine, suitable for the composition of the smaller newspaper office. * * * It is designed to substitute machine-made slugs, or lines of type for the hand-set body matter of the newspaper, at lowest cost. Its aim is newspaper composition, of good quality, at lowest cost. * * * The nearest place to you having a machine is Mason News, A. L. Rose publisher. It has been in use there about 5 years. We send you copy of the paper. * * * We send you also copy of the Sunfield Sentinel, in the northern part of your county. * * * You might well pay a visit to Mason on a day when their machine is running, and view of the machine in operation would enable you quickly to understand points not always at once understood from written description," etc.

On September 8, 1913, Gifford was in Detroit and called at the Typograph Company's place of business, saw a machine in operation and slugs cast, discussed it with the representative of the company, and bought the one in question here at the regular price of $1,100 under a written contract of that date signed by both parties, the terms of which, so far as material here, being on his part a payment of $200 down and the balance in monthly payments of $20, with interest at 5 per cent. per annum on unpaid balances computed half-yearly, the vendor on its part agreeing to supply him all repair parts at net list prices, protect him against infringement of patents and guaranteeing that—

"the machine shall be free from defect in both material and construction, and will replace, free of charge to the vendee, any part or parts (matrices and spacers excepted), not so proving for one year from date of installation of the machine, after the alleged defective

part or parts have been examined by the vendor or its agent."

On the back of the contract, under the heading— "Guarantee and conditions to the within agreement" were set out conditions as to installation, and various other details irrelevant in this inquiry, with a guaranty by the vendor that "the plant and fixtures shall be of standard material, well finished and of good, merchantable quality," and a requirement that the vendee keep the property insured to protect the vendor's unpaid balances.

The machine was shipped to Gifford September 11, 1913, and on notice from him of its receipt the company sent an experienced man to install it and give instructions in its care and operation. He installed it, instructed Gifford in its use and mechanism, including how to take it down and put it together again. He remained until it had been in operation two full days and when he left on September 18, 1913, received the following certificate from him, addressed to the Typograph Company:

"This is to certify that Typograph No. 734 has been properly installed and is giving satisfaction.
"R. D. GIFFORD."

On September 23, 1913, Gifford wrote the company saying he had been using the machine and found it "all right in every way," so far as he could see, and was "very much pleased with it," except that it did not line very well and he thought a heavier face, printed sample of which he inclosed, would do better.

On September 30, 1913, the company replied saying the last week's issue of his Review looked well and they thought he would be pleased with the No. 11 face he was using after he had seen it a few weeks, but if he decided he wanted the face he expressed a preference for they would make the exchange.

On October 3, 1913, he wrote inclosing check for $20 to meet payment due October 1st, saying:

"The machine is working fine and am having no trouble whatever with it.    However, I am not very well satisfied with the face I have on account of the alignment.    Will you please ship me the other face—the smaller heavy eight-point.    I believe it will suit me better."

The face he asked for was sent him and after trying it for a time he wrote the company saying he did not like it as well as the first, and named a third, No. 15, which he said he always liked best, requesting it be sent him, offering to return the others and defray any expense of the exchange.    The third face was sent him as requested.    In the correspondence on this subject he made no complaint of the machine, although he admitted "At that time we had tried it out on job work," and said "It seemed to be a matter with me as to which kind of face I wanted and I kept trying to see if one suited me better."

On December 12, 1913, he wrote the company:

"Am getting along very well with the machine, although I find it impossible to get surface even enough on slug to do any kind of job work, with the exception of on soft surface paper.    Possibly you could suggest some remedy for this.

"Very truly,
"R. D. GIFFORD."

On December 13, 1913, the company replied:

"The Typograph was not designed for job work purposes, though much product of that nature has been done.    Where care and some extra time is given, when casting the lines, type face will be found uniformly even, and of a quality permitting use of hard paper and fine ink," giving detailed instructions as to proper method and care in casting lines.

On February 20, 1914, he next wrote the company inclosing $20 to apply on machine, of which he made

no complaint, explaining business had been so poor he could not remit sooner, saying in conclusion, "Will try and make up what I am back on payments in the near future."

On April 17, 1914, he wrote the company as follows:

"Enclosed please find check for $23, twenty to be applied on purchase price of machine (of which he made no complaint), and the other three is for four (4) spacers, which I believe you told me were 75 cents each.    Please send the spacers at once.    Business is beginning to pick up now and I will try and get caught up with my payments by the next time payment is due, if possible."

He made no more payments, but on April 29, 1914, wrote the company telling of some trouble he was having with metal he bought of the Great Western Metal Works which he thought needed more tin and antimony, saying in part: "I have had no trouble previous to this with the metal.    Where can I get those two articles and how much of each should I add to the pot-full of metal?"    The Typograph Company did not make or furnish the metal and he explained that he was "merely writing for an opinion as to how to prepare it."

In this letter he found no fault with the machine. He testified, however, that after using it off and on until May 8, 1914, following the company's directions and trying it every way possible, "I came to the conclusion it would not do the work and I wrote them to that effect along about May or June, 1914.   *   *   * I wrote them the machine was there at their disposal about May, 1914."    Plaintiff denied ever receiving such a letter and he produced no copy of it.    The officer of the company who installed the machine, knew Gifford's handwriting and was familiar with the correspondence, testified that Gifford "never notified us he refused to take it," but that he wrote them in November, 1914, "proposing to sell this machine to

the Springport Signal." Asked about this Gifford said:

"The Springport Signal man was in the office one day, saw the machine and asked me about it. I told him it was one I had been trying out for several months and told him why it was not satisfactory, and if he could make arrangements with the company to take it off my hands it would be all right with me, and it was of no use to me whatever. As I recall, I wrote the company and asked them in regard to the proposition."

Whether or not he in May or June, 1914, or ever, gave notice of rescission and tendered back the machine, was made an issue of fact under the conflicting testimony, with the burden of proof resting upon defendant, but in the concluding portion of the charge that question was submitted to the jury in connection with an indicated issue of warranty, express or implied, as follows:

"If you find from the evidence in this case that this machine was sold to defendant upon the representation and understanding that it was suitable for and would do the work in his office, including job work, and if you also find that it was not suitable for this class of work and was not as represented, and if you further find that defendant did not rescind the sale and notify the seller that the machine was at defendant's office, subject to the order of the seller, then the defendant has the right to recoup in this action the difference between what this machine was actually worth and the contract price. I instruct you that if you find a verdict for the defendant in this case and you further find that he, on or about the month of June, 1914, notified the plaintiff that the machine would not do his work, and was not as represented and that he would not keep said machine, and that said machine was at his place subject to the order of plaintiff, then I instruct you that the defendant is entitled to recover the amount that he has paid on said machine as shown by the proofs as $299.97, your verdict in such case would be for the defendant for that amount."

We find no testimony in the case as to the difference between what this machine was actually worth and the contract price, beyond defendant's statement that it was worthless to him. His statement that he had paid $299.97 on the purchase price was not disputed. After being out a time the jury returned for further instructions and the foreman said, "We would like to know if there is any compromise between the claim of plaintiff for $805 and interest or the $299.97 of the defendant, if there is a compromise between the two?" The court answered, "There would be no compromise," called attention to what was said in the foregoing quotation from the charge, repeating it in substance, and saying in conclusion:

"In the event you find such notice was given as the defendant claims he gave notice, then your disposition of it, and you find it did not come up to the contract and agreement, then you would dispose of it by finding how much it actually was worth as compared to the contract price and give a verdict for the difference and in that case, Mr. P. (defendant's attorney), I suppose the defendant would keep the machine?

"Mr. P: Oh, yes.

"But if you find the notice was given you must either give a verdict for the plaintiff of the amount claimed if he is correct but otherwise if you find it did not come up to the agreement he can recover the amount paid on the machine."

The matter of notice was an important and square issue of fact upon which plaintiff tendered requests for instruction in detail which were refused. If justified in refusing them in the exact form tendered, plaintiff was entitled to have most of their substance given, and the jury more fully instructed on that subject. Defendant's own letters and testimony at least carried to the jury the question of estoppel by delay and laches, as to which plaintiff tendered requests. It was defendant's duty, under the circumstances shown here, to fully inspect and test the machine after

it had been installed and turned over to him as soon as practicable—within a reasonable time—and, if he had reason and desired to rescind, to thereafter promptly give notice to plaintiff. He certified to plaintiff on September 18, 1913, that the machine was installed and giving satisfaction, wrote and made payments and promises thereafter as related, made no complaint of the machine in his last letter of April 27, 1914, used it until May 8, 1914, and then in May or June, as he testified, mailed his notice of rescission.

This written contract contains no doubtful or obscure provisions making parol evidence admissible in aid of its construction. Gifford's most distinct grievance is, as pointed out in his counsel's brief, that plaintiff's agent, Best, with whom he negotiated when he bought the machine, falsely told him it would do as good work as any other line-casting machine, and would do good job work. On that issue no question of an honest misrepresentation made in good faith was involved. Best, who had been with the company over 20 years, but was not connected with it at the time of the trial, made positive denial in detail of the false representations charged, saying in part:

"This machine was not serviceable for job work, and wasn't sold for that purpose, at all. The statement was never made that the machine was for general job work."

The oral testimony on that issue was only admissible to show that the contract was void, or voidable at defendant's option, because of fraud and deceit in its inception, consisting of false representations which defendant believed and was thereby fraudulently induced to enter into the contract. "Fraud" and "deceit" are nowhere directly mentioned in the charge and it nowhere in distinct language as requested clearly states the rule that where there is a written contract containing an express warranty, no other or different

may be inferred. *John D. Gruber Co.* v. *Smith*, 195 Mich. 336; *Youngs* v. *Advance-Rumely Co.*, 215 Mich. 682, and cases cited.

Early in the charge, after stating the claims of the parties, the court said:

"The contract was in writing and connected with the same there was a guaranty as to quality of material in said machine and also as to workmanship in its construction but the action is not defended upon anything connected with such guaranty. The defense is based on certain representations which the defendant claims were made to him as to what the machine would do and which defendant claims it has not done and does not do."

Thus telling the jury, in effect, that they might go outside the guaranty in the written contract to determine the rights of the parties on oral representations, without subsequently making clear that such representations could in no sense be treated as guaranties, or any part of the contract, or to aid in construing the contract, left a suggestion of guaranty by oral representations running through the case which was prejudicial error.

In harmony with the delicacy with which the question of untruthful representations was put to the jury, counsel for defendant contend that if the court should be of the opinion the alleged false and fraudulent statements "were in legal effect warranties, yet they would constitute implied warranties as distinguished from express warranties and for that reason could be relied on by the defendant as a defense to the action." They cannot be so construed. The written contract contained express warranties.

As the trial took shape under the oral testimony, the issue was one of fraud and deceit by false representations knowingly made and believed by defendant inducing him to enter into the contract, and without which he would not have done so. Representations

are precursors to a contract. They do not enter into the contract, their purpose is accomplished when the contract is made. A guaranty or warranty is a matter of contract, must be a part of the contract itself upon which the minds of the parties meet, and cannot exist without it. To fairly view and rightly dispose of the issue, the jury should have been instructed in plain terms as to this important distinction between a representation which precedes but is not an element of the contract, and a guaranty which necessarily becomes a part of the contract. This was not done in the instant case. Defendant's claim of right to rescind this contract is based on fraudulent representations as its inducing cause. which necessarily preceded the contract itself.

For the foregoing reasons the judgment is reversed, with costs to plaintiff, and a new trial granted.

CLARK, C. J., and MCDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.