HERITAGE RESOURCES, INC v
CATERPILLAR FINANCIAL SERVICES CORPORATION

Docket No. 284036. Submitted June 9, 2009, at Grand Rapids. Decided
June 30, 2009, at 9:00 a.m.

Heritage Resources, Inc., brought an action in the Kent Circuit Court
against Caterpillar Financial Services Corporation, Michigan Tractor
& Machinery Company (MCAT), and Gencor Industries, Inc., alleg-
ing, among other claims, breach of express warranties, breach of the
implied warranty of fitness for a particular purpose, and breach of the
implied warranty of merchantability relating to a rock classification
machine, or trommel, purchased by the plaintiff from MCAT, fi-
nanced by Caterpillar Financial, and manufactured by Gencor. Before
trial, the plaintiff entered into settlement agreements with MCAT
and Caterpillar Financial, under which the plaintiff released them
from liability for all claims. After a bench trial, the court, Donald A.
Johnston, J., entered a judgment and award of damages for the
plaintiff and against Gencor. The plaintiff appealed, claiming that the
trial court erred by failing to award additional damages. Gencor
cross-appealed, claiming that it could not be liable to the plaintiff for
breach of warranty because it had no contract with the plaintiff and
therefore made no warranties.

The Court of Appeals *held*:

1. As a matter of law, Gencor could not have made any express
warranties directly to the plaintiff. Under § 2313 of the Uniform
Commercial Code, MCL 440.2313, express warranties are limited to
statements, descriptions, representations, samples, and models that
are made part of the basis of the bargain. Where, as between the
plaintiff and Gencor, there is no contract, and therefore no bargain,
there can be no express warranty under § 2313.

2. Any express warranties made by Gencor to MCAT in their
contract were assigned to the plaintiff by MCAT under the terms of
the contract between the plaintiff and MCAT. However, because the
Gencor-MCAT contract was not introduced into evidence, the Court
of Appeals cannot determine whether Gencor made express warran-
ties to MCAT that the plaintiff, by assignment, can assert against
Gencor.

3. The implied warranties of merchantability and fitness for a

particular purpose arise by operation of law, MCL 440.2314; MCL 440.2315. Assuming that Gencor did not disclaim these implied warranties, as it could have under MCL 440.2316, the plaintiff, under the terms of the release it granted to MCAT, is precluded from enforcing the implied warranties. The plaintiff completely released and discharged any and all actual and potential claims against MCAT and any other person, firm, business entity, or corporation charged or chargeable with responsibility that is or may be derivative from MCAT. Gencor was charged or chargeable with responsibility that is or may be derivative from MCAT with respect to the plaintiff's implied warranty claims, and those claims were released in the settlement agreement between the plaintiff and MCAT.

Reversed and remanded for the entry of judgment in favor of Gencor.

HOEKSTRA, J., concurring, stated that he is required by MCR 7.215(J) to follow caselaw that adopted the flat-bar rule. He would adopt the intent rule instead and would hold in this case that the plaintiff did not intend for its settlement agreement with MCAT to release and discharge its implied warranty claims against Gencor.

1. SALES — UNIFORM COMMERCIAL CODE — WARRANTIES — EXPRESS WARRANTIES.

An express warranty by a seller of goods cannot be created between a seller and a buyer of goods in the absence of a contract for the sale of the goods (MCL 440.2313).

2. SALES — UNIFORM COMMERCIAL CODE — WARRANTIES — IMPLIED WARRANTIES OF MERCHANTABILITY — IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE.

The implied warranty of merchantability and the implied warranty of fitness for particular purpose in a sale of goods arise through implication by operation of law but may be excluded or disclaimed by the seller (MCL 440.2314, 440.2315, 440.2316).

*Schenk, Boncher & Rypma* (by *Brent W. Boncher*) for Heritage Resources, Inc.

*Dickinson Wright PLLC* (by *Richard A. Glaser* and *Rock A. Wood*) for Gencor Industries, Inc.

Before: JANSEN, P.J., and HOEKSTRA and MARKEY, JJ.

JANSEN, P.J. Following a 16-day bench trial, the circuit court determined that defendant Gencor Industries,

Inc. (Gencor), had breached certain express warranties and entered judgment for plaintiff Heritage Resources, Inc. (plaintiff or Heritage), in the amount of $69,257 plus interest and taxable costs. Plaintiff appeals by right, arguing among other things that the circuit court erred by failing to award it substantial additional damages. Gencor cross-appeals, arguing that the circuit court erred by entering judgment in favor of plaintiff because it did not have a contract with plaintiff and made no warranties to plaintiff. For the reasons set forth in this opinion, we reverse and remand for entry of judgment in favor of Gencor.

I

Plaintiff, owned by brothers Kirk and Kim Velting, had been involved in heavy aggregate mining for several years. Plaintiff became interested in purchasing a rock classification machine, also known as a "trommel," from Michigan Tractor & Machinery Company (MCAT).[1] Plaintiff entered into discussions with MCAT representative Paul McCourt concerning its desire to purchase such a machine. McCourt, Kirk Velting, and another MCAT customer traveled to Kansas to view a rock classification machine that had been manufactured by Gencor.[2] Velting believed that the type of Gencor rock classification machine he viewed in Kansas would be generally suitable, provided that Gencor could

---

[1] MCAT was Gencor's dealer in Michigan. MCAT and its financing arm, Caterpillar Financial Services Corporation, are not parties to this appeal.

[2] Most or all Gencor rock classification machines were apparently manufactured by Gencor's British subsidiary, which has evidently gone out of business and ceased to exist. The distinction between Gencor and its British subsidiary is not relevant for purposes of the present appeal. Throughout this opinion, we will refer to both Gencor Industries, Inc., and its former British subsidiary as "Gencor."

build the machine to plaintiff's specifications. Among other things, Velting expressed that plaintiff would be interested in purchasing a Gencor rock classification machine (1) with hydraulic legs that could lift the machine so that a front-end loader could remove the sorted rock from underneath the unit, (2) with chutes or bins rather than a conveyor system, (3) with flared, hinged sides to accommodate loading by dump trucks, and (4) with a front "stopper plate" to prevent large boulders from being pushed under the machine.[3]

McCourt did not know whether Gencor could manufacture a rock classification machine according to these specifications. He arranged for Kirk Velting to meet with Michael Dunne, a Gencor sales representative. McCourt, Velting, and Dunne met for lunch at a Grand Rapids area restaurant in December 2000 and discussed whether Gencor could manufacture a machine to meet plaintiff's specific needs. Dunne allegedly represented that Gencor could fully satisfy plaintiff's requirements by manufacturing a machine that met all the desired specifications. However, no written agreement was produced at the lunch meeting. The parties did not discuss pricing at the lunch meeting, nor did Velting agree that plaintiff would purchase anything from, or pay anything to, MCAT or Gencor. The parties did apparently sketch on napkins while they met, but Dunne evidently took the napkins with him after the meeting. In addition, Dunne presented Velting with a Gencor brochure,

---

[3] Plaintiff also wanted a rock classification machine with a flat back, so that it could be placed directly against a quarry wall for loading by dump trucks. The Gencor rock classification machine that Velting viewed in Kansas apparently had a flat back, so Velting assumed that all Gencor machines were manufactured with flat backs. However, when the machine was ultimately delivered, plaintiff discovered that it had been manufactured with a curved back and could not be placed directly against a quarry wall for loading by dump trucks.

which depicted Gencor rock classification machines and described them as "portable," "heavy duty," "low maintenance," able to produce "from 100 to 1000 tons per hour," able to be loaded from the rear by dump trucks, and able to function automatically without a human operator.

Velting informed Dunne that plaintiff would not want certain items included on its machine, such as the conveyor system that Velting had seen on the Gencor machine he observed in Kansas. Velting and Dunne also discussed timing issues, including when the Gencor machine could be delivered to plaintiff's Michigan site and whether the machine would arrive in time for the 2001 spring season. Velting testified that Dunne had also guaranteed him that the machine would be able to achieve and sustain a certain rate of production. The trial testimony varied considerably concerning the remaining items that were discussed at the lunch meeting. But it is undisputed, as the circuit court found, that "no contract was finalized or entered into" at the lunch meeting and that "[n]o confirming letter, memorandum, or any other writing of any kind was ever prepared by any of the three participants at the [lunch meeting] to summarize what had been discussed, represented, or agreed to there."

On January 5, 2001, MCAT sent plaintiff a quotation for a Gencor rock classification machine, describing the various components as a "Feed Hopper and Feeder," a "Rotary Screen," a "Main Underframe/Chassis," a "Control Panel," and a "Collecting Hopper and Conveyor." The document quoted a "Price F.O.B. Delivered" of $532,000. Among other things, the quotation stated that the Gencor machine would include (1) a steel "[f]eed hopper" with a capacity of 27.5 tons, (2) "[f]old up and pin hopper extensions to accommodate 40 ton

articulated dump trucks," (3) a "[r]eciprocating tray
type" feeder that would be "[f]itted directly under [the]
feed hopper" and driven by a "hydraulic system pow-
ered by a CAT diesel engine," (4) a "[r]otary screen"
with a diameter of 6 feet and a length of 33 feet, 4
inches, to be driven by the "main CAT [d]iesel [e]n-
gine," (5) a "[m]ain underframe" "[c]onstructed from
rolled steel joists and channel sections of welded con-
struction and heavily braced for strength and stability,"
(6) a "[r]unning gear," consisting of a "[q]uad-axle bogie
fitted at [the] feed hopper end with . . . twin tyres, air
brakes, screw type parking brake and 5th wheel towing
connection at the discharge end," (7) a "[c]hassis fitted
with hydraulic jacking type stabilising legs, (8) a "[c]ol-
lecting hopper . . . [f]itted under the screening section,"
to be "[s]upported from the inside of the main chassis"
and "[h]inged at the feed end with discharge point at
the rear end of the unit," and (9) a "6 ft x 45 ft" "[b]elt
conveyor" with a "[f]rame . . . [m]anufactured from
heavy duty rolled steel channels." As the circuit court
noted, the quotation "did not include certain of the
things which Kirk Velting testified that he had been
promised by Michael Dunne at the [lunch meeting]."
For example, the quotation did not include any guaran-
teed rate of production and expressly stated that it
excluded "[a]ny item not definitely specified." As the
circuit court observed, "[n]either the Velting brothers,
nor anyone else acting on behalf of [plaintiff], ques-
tioned the quot[ation] in any way, or requested that it
be amended to include the items Kirk Velting testified
were important to him, especially a guaranteed rate of
production."

Notwithstanding the fact that the quotation did not
mention certain items that were apparently important
to the Veltings, plaintiff and MCAT entered into a
"Sales and Security Agreement" on January 15, 2001,

which was signed by representatives of both parties. The sales agreement stated that plaintiff had agreed to purchase, among other things, a "Gencor Portable 182M." As is made clear by other documents contained in the lower court record, the Gencor 182M was the rock classification machine that was the subject of MCAT's quotation of January 5, 2001.[4] A space was provided on the sales agreement form for the parties to specify any warranties to be made by MCAT. However, the space was left blank.

Plaintiff began making preparations at its site in anticipation of the delivery of the machine. Then, in early March 2001, plaintiff received a fax containing "as built" drawings of the Gencor 182M. Upon receipt of the drawings, plaintiff realized that the machine had been built with a curved back rather than with a flat back as Kirk Velting had desired. However, as found by the circuit court, "neither Kirk Velting nor anyone else acting on behalf of [plaintiff] raised any objection or complaint about this non-conformity with either Gencor or MCAT, and no attempt was made to cancel the order." At that point, MCAT apparently informed plaintiff that the machine was already en route, but that it would be "a few weeks" late.[5]

Plaintiff had already purchased dump trucks and other equipment, and had hired several laborers, in anticipation of the expected delivery of the Gencor machine. Thus, plaintiff argues, it was "compelled to go ahead with the purchase and try to make it work since it already had procured . . . machinery for the operation

[4] In the same sales agreement of January 15, 2001, plaintiff also agreed to purchase certain other pieces of equipment from MCAT. The agreement did not contain a separate price for the Gencor 182M, but instead included a total price of $1,458,500 for all the specified equipment.

[5] However, the machine did not arrive until July 2001.

that was being anchored by the Gencor machine."
Plaintiff engaged in what it describes as "mitigation of
damages" by modifying its site to better accommodate a
machine with a curved back, by laying off or reassigning
laborers who had already been hired to work on the
machine, and by making other alterations and modifi-
cations. Plaintiff argues on appeal that, "[i]n hindsight,
[plaintiff] may have been better off canceling the order
at that time but it had no idea that other problems
would arise and could not simply return the other
equipment" that it had already purchased.

On March 7, 2001, plaintiff and MCAT entered into a
second "Sales and Security Agreement" pertaining to
the "Gencor Portable 182M." This second agreement
contained a purchase price of $542,000, which was
$10,000 higher than the price specified in the original
quotation of January 5, 2001. Like the first sales
agreement, the March sales agreement form contained
a space in which the parties could specify any warran-
ties to be made by MCAT. In the space "Std. Man.
Warranty" was written by hand. Below the words "Std.
Man. Warranty," the sales agreement stated in relevant
part:

> BUYER ACKNOWLEDGES THAT SELLER IS NOT
> THE MANUFACTURER OF THE EQUIPMENT AND
> DOES NOT MAKE AND IS NOT AUTHORIZED TO
> MAKE ANY WARRANTY. THE WARRANTY PROVIDED
> ABOVE IS THE SOLE WARRANTY, IS EXPRESSLY IN
> LIEU OF ALL OTHER WARRANTIES, EXPRESS OR
> IMPLIED, INCLUDING WITHOUT LIMITATION THE
> IMPLIED WARRANTIES OF MERCHANTABILITY AND
> FITNESS FOR A PARTICULAR PURPOSE. . . . SELLER
> ASSIGNS TO BUYER, TO THE EXTENT ASSIGNABLE,
> ANY WARRANTIES OF THE EQUIPMENT BY ITS
> MANUFACTURER, PROVIDED THAT ANY ACTION
> TAKEN BY BUYER BY REASON THEREOF SHALL BE
> AT THE EXPENSE OF BUYER. IN THE EVENT THAT

SELLER HAS ASSUMED ANY RESPONSIBILITIES [FROM THE MANUFACTURER] WHATSOEVER, SELLER'S SOLE OBLIGATION AND BUYER'S SOLE REMEDY FOR BREACH OF SUCH WARRANTY IS SELLER'S PROVIDING OF PARTS AND SERVICE THE SELLER DETERMINES ARE REQUIRED FOR PERFORMANCE OF THE WARRANTY. [Capitalization in original.]

On June 28, 2001, MCAT sent plaintiff an invoice for the Gencor 182M in the amount of $542,000. The invoice indicated that the Gencor machine would come with a "Standard Manufacturer's Warranty." On July 1, 2001, MCAT or its financing arm, Caterpillar Financial Services Corporation (CAT Financial), entered into an installment sales contract with plaintiff, by which plaintiff agreed to purchase the Gencor machine through 36 equal monthly payments of $15,978.85.[6]

On July 31, 2001, MCAT sent plaintiff an invoice for a "Hercules Rotary Screen," which was apparently one component of the Gencor machine, in the amount of $400,000. It is not clear why this second invoice, which only included the rotary screen component, was sent separately to plaintiff after the invoice of June 28, 2001, had already been sent.

When the Gencor machine ultimately arrived in Michigan in July 2001, it was delivered to the Battle Creek customs yard rather than to plaintiff's site as the Veltings had wanted. As the circuit court noted, "Kirk Velting and Paul McCourt went [to Battle Creek] to inspect [the machine]. They could easily discern that ... the machine had a sloped rather than a flat back, but without actually setting it up and operating it, they were unable to discern whether in other respects it was consistent with what they

---

[6] These 36 monthly payments of $15,978.85 would total $575,238.60, which consisted of the purchase price of $542,000 plus certain fees and finance charges.

had ordered." McCourt told Velting to "take it or leave it,
as is," because it was the last rock classification machine
to be manufactured by Gencor's British subsidiary and
that if plaintiff did not accept it, someone else would. Kirk
Velting apparently spoke with his brother on the tele-
phone and agreed to accept the machine. McCourt told
Velting that MCAT would be willing to "work with [plain-
tiff]" regarding the machine. As the circuit court ob-
served, "[n]o representative of Gencor was present [at the
Battle Creek customs yard], and Gencor made no prom-
ises with respect to the machine at this time."

Upon transporting the Gencor machine to plaintiff's
site, the Veltings realized that the machine failed to
conform with their wishes in several other respects. For
instance, the machine did not have flared and hinged
sides, it did not have chutes or bins underneath to
collect the processed material, the front "stopper plate"
was not high enough to prevent rocks from being
pushed underneath the machine, it had been built with
the unwanted conveyor system that Kirk Velting had
seen on the Gencor machine he observed in Kansas, and
the hydraulic system or power source was too weak to
allow the hydraulic legs to raise the machine suffi-
ciently.

Once the Gencor machine was running at plaintiff's
site, other serious problems arose. Specifically, hydrau-
lic and electrical problems caused frequent breakdowns.
Because the machine was frequently broken and inop-
erable as a result of these hydraulic and electrical
problems, plaintiff alleges that it incurred substantial
additional damages in the form of lost profits and wages
paid to its laborers during the "down time."

As the circuit court properly noted, plaintiff "looked
primarily to MCAT to address [the] numerous problems

[with the machine]," and "MCAT did, in fact, perform a number of repairs and corrective measures." MCAT also "withheld from Gencor $25,000 of the purchase price paid by [plaintiff], to address the absence of factory built bins and chutes for the machine, which sum was eventually returned to [plaintiff]." As the circuit court observed, "[w]hen MCAT ceased doing repairs on the machine, [plaintiff] continued to do them at its own expense."

After several repairs and modifications, by both MCAT and by plaintiff itself, the Gencor machine was made usable. Indeed, at the time of trial, plaintiff was still using the Gencor machine to sort rocks for retail sale. As the circuit court noted, plaintiff "never attempted to sell or return the Gencor 182M" and has "continued to use it for its intended purpose."

II

Plaintiff sued Gencor, MCAT, and CAT Financial in the Kent Circuit Court, setting forth various claims, including breach of contract, breach of express warranty, breach of the implied warranty of fitness for a particular purpose, and breach of the implied warranty of merchantability. As noted previously, MCAT and CAT Financial are not parties to this appeal. Before trial, plaintiff entered into separate settlement agreements with MCAT and CAT Financial and released all present and potential claims and causes of action against both entities in exchange for certain enumerated consideration. The settlement agreement between plaintiff and MCAT provided in relevant part:

> Complete and Mutual Release of All Claims. Heritage, on its own behalf and for its heirs, executors, administrators, personal representatives, successors, assigns, and any other person who may be entitled to assert

claims under the transactions identified in this settlement agreement, completely releases and discharges Michigan CAT, a Michigan corporation, its agents, servants, and employees, and any other person, firm, business entity or corporation charged or chargeable with responsibility which is or may be derivative from Michigan CAT, and their heirs, executors, administrators, personal representatives and assigns, from any and all actual and potential claims, demands, actions, causes of action, damages, costs, loss of services, expenses, compensation and any and all consequential damages on account of or in any way growing out of or connected with any of the transactions which at any time have occurred between the parties to this agreement, whether or not included in Kent County Circuit Court Case No. 03-01720-CK. Michigan CAT, a Michigan corporation, on its own behalf and for its heirs, executors, administrators, personal representatives, successors, assigns, and any other person who may be entitled to assert claims under the transactions identified in this settlement agreement, completely releases and discharges Heritage, its agents, servants, and employees, and any other person, firm, business entity or corporation charged or chargeable with responsibility which is or may be derivative from Heritage, and their heirs, executors, administrators, personal representatives and assigns, from any and all actual and potential claims, demands, actions, causes of action, damages, costs, loss of services, expenses, compensation and any and all consequential damages on account of or in any way growing out of or connected with any of the transactions which at any time have occurred between the parties to this agreement, whether or not included in Kent County Circuit Court Case No. 03-01720-CK. The parties hereby mutually agree to release all such claims, whether presently known or unknown, which either may now have or which either may in the future ever have against the other parry in connection with any of the transactions identified in this settlement agreement.

The settlement agreement between plaintiff and CAT Financial provided in relevant part:

> In consideration of CAT Financial's partial forgiveness of the debt owed to it by Heritage . . . , Heritage agrees: (1) to immediately dismiss the above-mentioned lawsuit against CAT Financial with prejudice and without costs (each party will be responsible for paying their own attorney fees and other litigation expenses); and (2) Heritage acknowledges that the partial forgiveness of the debt it owes to CAT Financial is to be considered payment in full to it, its assigns, representatives, heirs or successors and that Heritage and its assigns, representatives, heirs or successors are giving up the right to pursue all claims or potential claims against CAT Financial and its owners, shareholders, employees, assigns, representatives, heirs or successors.

On December 15, 2005, the circuit court entered an order dismissing with prejudice any and all claims against CAT Financial, and on December 17, 2005, the circuit court entered an order dismissing with prejudice any and all claims against MCAT.

The lower court record makes clear that by the time of trial, plaintiff was no longer pursuing its claims of breach of contract and promissory estoppel. Indeed, Kim Velting admitted at trial that there had been no contract between plaintiff and Gencor. Instead, plaintiff proceeded to trial against Gencor on its claims of breach of express warranty, breach of the implied warranty of fitness for a particular purpose, and breach of the implied warranty of merchantability. Plaintiff's theory at trial was that Gencor had made specific express warranties running in its favor at the initial lunch meeting between the parties and that other implied warranties had accompanied the initial sale of the machine under the Uniform Commercial Code.[7]

---

[7] In contrast to this position taken at trial, Kim Velting had testified at his 2004 deposition that "[plaintiff] didn't have a warranty with Gencor."

Following trial, the circuit court issued extensive findings of fact and conclusions of law.[8] The court captured the essence of plaintiff's claims in its prefatory statement that Michael Dunne's "alleged oral representations at the [lunch meeting] of December 2000 form the basis of Plaintiff Heritage Resources' warranty claims against Gencor." The circuit court found, consistently with Paul McCourt's testimony at trial, that Dunne had not guaranteed any specific rate of production at the lunch meeting. This was in contrast to the trial testimony of Kirk Velting, who testified that Dunne had guaranteed that the Gencor machine would be able to achieve a sustained production rate of 400 tons an hour. The circuit court noted that McCourt was "the more disinterested witness," that McCourt had "evinced a clearer recollection of the [lunch meeting]," and that McCourt had "testified more consistently with the other known facts . . . ." Therefore, the court accepted McCourt's testimony over that of Velting with respect to the contested rate-of-production issue.

The circuit court went on to find that "[n]o price was discussed at the [lunch meeting], and no contract was finalized or entered there." As noted earlier, the court also found that "[n]o confirming letter, memorandum, or any other writing of any kind was ever prepared by any of the three participants at the [lunch meeting] to summarize what had been discussed, represented, or agreed to there."

Despite the circuit court's findings in this regard, the court concluded that "[t]he contract was for the purchase and sale of a Gencor 182M trommel, to be built according to specifications contained in [the quotation

---

[8] The circuit court appears to have considered only plaintiff's express-warranty claims. It is unclear why the court failed to consider plaintiff's implied-warranty claims as well.

of January 5, 2001], and as promised at the December 2000 [lunch meeting]." The circuit court further concluded that "[t]he Gencor 182M trommel delivered by defendant Gencor in early July 2001, did not conform to the contract specifications in several respects" and that while "MCAT addressed and remedied some of these nonconformities, . . . plaintiff Heritage eventually addressed the others at its own expense." The court observed that "the reasonable measure of plaintiff's damages is the actual cost to plaintiff of remedying the nonconformities" and concluded that plaintiff had proven damages in the amount of $94,257.[9] From this $94,257 amount, the court deducted the $25,000 that MCAT had withheld from Gencor and eventually remitted back to plaintiff.[10] On February 11, 2008, the circuit court entered judgment for plaintiff in the amount of $69,257 plus interest and taxable costs.

III

Following a bench trial, we review for clear error the circuit court's findings of fact and review de novo its conclusions of law. *Ligon v Detroit*, 276 Mich App 120, 124; 739 NW2d 900 (2007). A finding of fact is clearly

---

[9] The circuit court concluded that plaintiff had proven by a preponderance of the evidence that these $94,257 in damages flowed directly from Gencor's breach of its express warranties to plaintiff. These damages included (1) $5,766 for the "absence of chutes and bins," (2) $17,304 for "hopper deficiencies," (3) $53,243 for "actual repair costs," (4) $13,347 for "electrical rewiring," and (5) $4,597 for "replacement of hydraulic lines."

[10] The circuit court concluded that Gencor had never made any express warranty with respect to whether the machine "would achieve any specific rate of production." The court also concluded that the other items of damages sought by plaintiff—including damages for lost production time, for untimely delivery of the Gencor machine, and for lost profits—had not been sufficiently proven. We do not disturb the court's factual findings or conclusions of law with respect to these particular matters.

erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Bracco v Michigan Technological Univ*, 231 Mich App 578, 585; 588 NW2d 467 (1998). Assuming the court's individual findings of fact are upheld, whether those facts have resulted in the formation of a valid contract or the creation of a warranty is a question of law to be reviewed de novo. See *id*.

We review de novo the proper interpretation of a statute. *Casco Twp v Secretary of State*, 472 Mich 566, 571; 701 NW2d 102 (2005). Similarly, whether a statute applies in a particular case is a question of law that we review de novo. *Alex v Wildfong*, 460 Mich 10, 21; 594 NW2d 469 (1999). When interpreting a uniform act, such as the Uniform Commercial Code, it is appropriate for this Court to look for guidance in the caselaw of other jurisdictions in which the act has been adopted. *Power Press Sales Co v MSI Battle Creek Stamping*, 238 Mich App 173, 180; 604 NW2d 772 (1999).

IV

Gencor argues on cross-appeal that the circuit court erred by entering judgment in favor of plaintiff because it did not have a contract with plaintiff and therefore could not have made any express warranties to plaintiff. In response, plaintiff argues that Gencor made express warranties running in its favor at the initial lunch meeting between the parties. Plaintiff also asserts that Gencor's sale of the rock classification machine was accompanied by certain implied warranties and that the circuit court erred by failing to consider plaintiff's implied-warranty claims. We hold that, as a matter of law, Gencor made no express warranties to plaintiff. We

further hold that plaintiff may not enforce any implied warranties that accompanied the initial sale of the Gencor machine.

A

We begin by noting that the existence of a contract or warranty in this case must be evaluated under the terms of the Uniform Commercial Code (UCC), MCL 440.1101 *et seq.* Article 2 of the UCC applies to "transactions in goods," MCL 440.2102, and the Gencor rock classification machine at issue here was indisputably a "good[]" within the meaning of the UCC. MCL 440.2105(1); see also *Sullivan Industries, Inc v Double Seal Glass Co, Inc*, 192 Mich App 333, 344; 480 NW2d 623 (1991), and *Neibarger v Universal Cooperatives, Inc*, 181 Mich App 794, 800; 450 NW2d 88 (1989), aff'd 439 Mich 512 (1992).

B

As is made clear by the circuit court's opinion in this case, and as plaintiff correctly points out on appeal, the court's award of damages for plaintiff was based on its finding that Gencor had breached certain express warranties that were purportedly made to plaintiff at the December 2000 lunch meeting. However, we conclude that, as a matter of law, Gencor made no express warranties to plaintiff at that time.

The creation of express warranties under the UCC is governed by MCL 440.2313, which provides in relevant part:

> (1) Express warranties by the seller are created as follows:
>
> (a) An affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of

the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) A description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) A sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he or she have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty . . . .

An express warranty may be created only between a seller and a buyer, and any such express warranty becomes a term of the contract itself. See Official Comment 2 to UCC § 2-313 (noting that "this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale"); 18 Williston, Contracts (4th ed), § 52:45, p 260 (stating that "an express warranty is 'part of the basis of the bargain' and therefore a term of the parties' contract"); 1 Hawkland, Uniform Commercial Code Series, § 2-313:2, pp 526-527 (stating that an "express warranty is merely a term of the contract . . . and it is not different in kind from other express terms such as price, delivery, or quantity"). Indeed, our Supreme Court has long implicitly recognized that an express warranty is no different than any other term of the contract. See *Salzman v Maldaver*, 315 Mich 403, 412; 24 NW2d 161 (1946) (observing that "where a written contract is clear and unambiguous, parol evidence of prior negotiations and representations cannot be adduced to create an express warranty and thereby vary

the terms of the contract"); *Murphy v Gifford*, 228 Mich 287, 297-298; 200 NW 263 (1924) (observing that "where there is a written contract containing an express warranty no other or different may be inferred"). MCL 440.2313 clearly provides that express warranties are limited to statements, descriptions, representations, samples, and models that are "made part of the basis of the bargain." Given this statutory language, we are compelled to conclude that where there is no contract, and therefore no "bargain," there can be no express warranty under MCL 440.2313. See *Klanseck v Anderson Sales & Service, Inc*, 136 Mich App 75, 86; 356 NW2d 275 (1984); see also *In re Masonite Corp Hardboard Siding Products Liability Litigation*, 21 F Supp 2d 593, 601 (ED La, 1998); *Sithon Maritime Co v Holiday Mansion*, 983 F Supp 977, 986 (D Kan, 1997); *Ralston Dry-Wall Co, Inc v US Gypsum Co*, 740 F Supp 926, 929 (D RI, 1990).[11] Given that it is undisputed that plaintiff had no contract with Gencor, we hold as a matter of law that Gencor could not have made any express warranties directly to plaintiff.

Of course, there *was* a contract between Gencor and MCAT, and Gencor therefore could have made express warranties to MCAT. In the sales agreement of March 7, 2001, MCAT assigned to plaintiff, "TO THE EXTENT ASSIGNABLE, ANY WARRANTIES OF THE EQUIPMENT BY ITS MANUFACTURER, PROVIDED THAT ANY ACTION TAKEN BY BUYER BY REASON THEREOF SHALL BE AT THE EXPENSE OF

---

[11] The fact that a buyer may have an "understanding" does not give rise to an express warranty under MCL 440.2313 when no express statement of warranty has been made. *Latimer v William Mueller & Son, Inc*, 149 Mich App 620, 631; 386 NW2d 618 (1986). Nor is a "general expression of opinion" sufficiently specific to create an express warranty under MCL 440.2313. *McGhee v GMC Truck & Coach Div, Gen Motors Corp*, 98 Mich App 495, 501; 296 NW2d 286 (1980).

BUYER." (Capitalization in original.) Therefore, under the terms of the sales agreement, plaintiff would have been able to enforce any express or implied warranties that had been made by Gencor to MCAT, assuming those warranties were otherwise assignable. See *Burkhardt v Bailey*, 260 Mich App 636, 652; 680 NW2d 453 (2004) (observing that "[u]nder general contract law, rights can be assigned unless the assignment is clearly restricted").

In order to determine whether any express warranties were made, it is generally necessary to examine the terms of the parties' contract. See *Strickler v Pfister Associated Growers, Inc*, 319 F2d 788, 789 (CA 6, 1963). However, plaintiff has not produced the contract between Gencor and MCAT on appeal. Nor is the contract between Gencor and MCAT contained in the lower court record. As a Gencor representative testified at trial, Gencor's contract with MCAT has apparently been lost or misplaced and was not available for production in response to plaintiff's pretrial request for documents. Without the contract between Gencor and MCAT, we simply cannot discern whether Gencor made any express warranties to MCAT that in turn would have been assignable to plaintiff. See *id*. At any rate, we note that plaintiff did not pursue this matter at trial. Indeed, as the circuit court observed, "[w]hile it is true that [plaintiff] may have received by assignment whatever warranty Gencor made to MCAT, that's not what [plaintiff is] suing on . . . ." Because plaintiff did not pursue at trial the issue whether Gencor's warranties to MCAT had been assigned to it, we decline to address this matter further on appeal. See *In re Schmeltzer*, 175 Mich App 666, 673; 438 NW2d 866 (1989).

Relying in part on *Spence v Three Rivers Builders & Masonry Supply, Inc*, 353 Mich 120, 126-135; 90 NW2d

873 (1958), plaintiff argues that even though it had no contract with Gencor, it can still enforce any express warranties made by Gencor because "[t]here is no requirement that there be privity of contract to recover when express warranties are made by a manufacturer to an end user." It is true that our Supreme Court, citing *Spence* and other cases, has previously held that for some remote purchasers it is unnecessary in actions for breach of implied warranty to establish privity of contract with the manufacturer. *Piercefield v Remington Arms Co, Inc*, 375 Mich 85, 98; 133 NW2d 129 (1965).[12] However, plaintiff is conflating the existence of an express warranty in the first instance with the existence of privity of contract. It is axiomatic that a remote plaintiff, or any plaintiff for that matter, cannot enforce a *nonexistent* warranty. And because an express warranty is merely a term of the contract, MCL 440.2313; 1 Hawkland, Uniform Commercial Code Series, § 2-313:2, pp 526-527, it necessarily cannot come into existence until the seller has contracted with *someone*. Only then, *after* the seller has created an express warranty by bargaining and contracting with a buyer, does it become relevant whether a nonparty to the contract—such as plaintiff in the instant case—must be in privity with the seller to enforce the warranty in his or her own right. We reiterate that MCAT was the only party with which Gencor had a contractual relationship in this case and that plaintiff has simply failed to provide any evidence concerning the express

---

[12] Our Supreme Court in *Piercefield* and *Spence* considered the issue of privity in the context of *implied* warranties. Our research has revealed no modern case in which the Supreme Court has ever held that privity of contract is unnecessary to enforce an *express* warranty. Indeed, because an express warranty is a term of the contract itself, MCL 440.2313; 1 Hawkland, Uniform Commercial Code Series, § 2-313:2, pp 526-527, we conclude that privity of contract *is* necessary for a remote purchaser to enforce a manufacturer's express warranty.

warranties, if any, contained in the Gencor-MCAT agreement. In an action for breach of express warranty, the court will not presume the existence of an express warranty, and the burden is on the plaintiff to prove that an express warranty exists. See *Hammel v Foor*, 359 Mich 392, 400; 102 NW2d 196 (1960). In short, plaintiff has failed to prove that any express warranties were actually made by Gencor in this case. It is therefore not relevant whether plaintiff was in privity of contract with Gencor for purposes of this issue.

C

Plaintiff argues that Gencor's initial sale of the rock classification machine was also accompanied by the implied warranties of merchantability and fitness for a particular purpose.[13] We hold that plaintiff's implied-warranty claims against Gencor were barred by plaintiff's settlement with MCAT.

Whereas an express warranty is a specific term of the parties' contract, MCL 440.2313; 1 Hawkland, Uniform Commercial Code Series, § 2-313:2, pp 526-527, the implied warranties of merchantability and fitness for a particular purpose arise through implication by operation of law, MCL 440.2314; MCL 440.2315. We have held in this case that, because an express warranty is a specific term of the contract, contractual privity is required for a plaintiff to enforce an express warranty against a remote manufacturer. In contrast, our Supreme Court has held, at least in certain circumstances, that an injured plaintiff who is not in privity of contract with a remote manufacturer may nonetheless enforce an *implied* warranty against that manufacturer. *Pierce-*

---

[13] The circuit court failed to address plaintiff's implied-warranty claims. However, any error in this regard was plainly harmless in light of our conclusion that plaintiff's implied-warranty claims were barred.

*field*, 375 Mich at 98; *Spence*, 353 Mich at 126-135. Much confusion surrounds our Supreme Court's decisions in *Piercefield* and *Spence*. As noted by several federal courts interpreting Michigan law, it is unclear if *Piercefield* and *Spence* removed the common-law privity requirement for plaintiffs in all actions for breach of implied warranty, or only for such plaintiffs who have not sustained solely economic losses.[14] Moreover, various panels of this Court have reached disparate results after applying the decisions in *Piercefield* and *Spence*. See *Cova v Harley Davidson Motor Co*, 26 Mich App 602, 604-610; 182 NW2d 800 (1970) (extending the rule of *Piercefield* and *Spence*, which eliminates the requirement of privity, to a claim of breach of implied warranty involving purely economic loss); but see *Auto-Owners Ins Co v Chrysler Corp*, 129 Mich App 38, 43; 341 NW2d 223 (1983) (holding that a party's claim of breach of implied warranty was barred by a lack of contractual privity with the remote manufacturer). Similarly, it is unclear whether the adoption of the UCC—and in particular Alternative A of UCC § 2-318, codified in Michigan as MCL 440.2318—has in any way affected the continued viability of *Piercefield* and *Spence*, neither of which was decided under the UCC. We urge the Supreme Court to clarify this matter, which has been the subject of increasing commercial litigation in recent years.

---

[14] See, e.g., *Pack v Damon Corp*, 434 F3d 810, 818-820 (CA 6, 2006) (stating that no privity is required under Michigan law for claims of breach of implied warranty); *Harnden v Ford Motor Co*, 408 F Supp 2d 315, 322 (ED Mich, 2005) (stating that privity is required under Michigan law for claims of breach of implied warranty); *Ducharme v A & S RV Ctr, Inc*, 321 F Supp 2d 843, 853-854 (ED Mich, 2004) (same); *Pitts v Monaco Coach Corp*, 330 F Supp 2d 918, 924-926 (WD Mich, 2004) (same); *Parsley v Monaco Coach Corp*, 327 F Supp 2d 797, 803-805 (WD Mich, 2004) (same); *Mt Holly Ski Area v US Electrical Motors*, 666 F Supp 115, 117-120 (ED Mich, 1987) (same).

We need not reach the ultimate issue whether the lack of privity between plaintiff and Gencor has foreclosed plaintiff's ability to enforce the implied warranties of merchantability and fitness for a particular purpose against Gencor. Instead, we hold that plaintiff's ability to enforce these implied warranties, assuming that such warranties existed, was barred by plaintiff's settlement with MCAT.

We will presume for purposes of this appeal that there were, in fact, implied warranties of merchantability and fitness for a particular purpose made by Gencor at the time of the initial sale to MCAT.

Although the implied warranties of merchantability and fitness for a particular purpose arise by operation of law, MCL 440.2314; MCL 440.2315, both of these implied warranties may be excluded or disclaimed by the seller, MCL 440.2316; *McGhee v GMC Truck & Coach Div, Gen Motors Corp*, 98 Mich App 495, 500; 296 NW2d 286 (1980). Because plaintiff has not presented any evidence of the terms or conditions of the contract between Gencor and MCAT, we cannot be certain whether the implied warranties of merchantability and fitness for a particular purpose accompanied the initial sale by Gencor or, in the alternative, whether Gencor disclaimed these warranties. We note that MCAT's standard-form agreements with plaintiff contain typical warranty disclaimer language, so it would not be unreasonable to assume that the agreement between MCAT and Gencor contained similar disclaimer language. At any rate, however, the point is that we do not know whether Gencor disclaimed either or both of the UCC implied warranties at the time of the sale to MCAT.

Without knowing whether Gencor disclaimed the implied warranties of merchantability and fitness for a

particular purpose at the time of its sale to MCAT, we cannot know whether these implied warranties ran from Gencor to plaintiff. This is because a remote purchaser is subject to the manufacturer's disclaimer of implied warranties in the same manner as the original purchaser and can acquire no greater implied-warranty rights from the manufacturer than the original purchaser can. See, e.g., *Theos & Sons, Inc v Mack Trucks, Inc*, 431 Mass 736, 740-741; 729 NE2d 1113 (2000); *Lecates v Hertrich Pontiac Buick Co*, 515 A2d 163, 166 (Del Super, 1986); *Gen Motors Corp v Halco Instruments, Inc*, 124 Ga App 630, 634; 185 SE2d 619 (1971). Accordingly, if Gencor disclaimed the UCC implied warranties in its initial sale to MCAT, those implied warranties would have been extinguished and could not have run to plaintiff.[15] We do not have sufficient evidence to determine whether this occurred. But because the seller generally has the burden of proving that an implied warranty has been disclaimed, see 67A Am Jur 2d, Sales, § 779, p 178; *Krupp PM Engineering, Inc v Honeywell, Inc*, 209 Mich App 104, 106 n 1; 530 NW2d 146 (1995), we will presume for purposes of this appeal that Gencor sold the machine to MCAT with the standard UCC implied warranties intact.

Notwithstanding the presence of any implied warranties running from Gencor to MCAT, however, we hold that the language of the settlement agreement

---

[15] Of course, even if Gencor had disclaimed the UCC implied warranties in its initial sale to MCAT, new implied warranties could have arisen in the subsequent sale from MCAT to plaintiff. However, plaintiff has settled all claims with MCAT. Further, the sales agreement between MCAT and plaintiff sufficiently disclaimed any new implied warranties of merchantability and fitness for a particular purpose that otherwise would have been created by MCAT's sale to plaintiff. MCL 440.2316; *McGhee*, 98 Mich App at 500.

executed between plaintiff and MCAT was sufficiently broad to release and discharge any outstanding implied-warranty claims that plaintiff may have had against Gencor. Specifically, the settlement agreement stated that plaintiff had agreed to "completely" release and discharge MCAT, as well as

> *any other person, firm, business entity or corporation charged or chargeable with responsibility which is or may be derivative from [MCAT]*, and their heirs, executors, administrators, personal representatives and assigns, from *any and all actual and potential claims*, demands, actions, causes of action, damages, costs, loss of services, expenses, compensation and any and all consequential damages on account of or in any way growing out of or connected with any of the transactions which at any time have occurred between the parties to this agreement, whether or not included in Kent County Circuit Court Case No. 03-01720-CK. [Emphasis added.]

The phrase "any and all actual and potential claims" is very broad. "[T]here cannot be any broader classification than the word 'all'. In its ordinary and natural meaning, the word 'all' leaves no room for exceptions." *Pritts v J I Case Co*, 108 Mich App 22, 30; 310 NW2d 261 (1981) (quotation marks and citations omitted). Moreover, we note that it is common for an injured purchaser to first seek redress from its immediate seller, and only then to look secondarily or derivatively to the remote manufacturer. This is not dissimilar to what plaintiff did in this case. Plaintiff did not name Gencor as a defendant in its original complaint, and only included Gencor as a defendant in its later amended pleadings. It is clear that plaintiff's initial inclination was to seek redress from its immediate seller, MCAT, which it considered to be primarily responsible for damages. Given that plaintiff looked primarily to MCAT in this case, we find

that Gencor was "charged or chargeable with responsibility which is or may be derivative from [MCAT]" within the meaning of the settlement agreement. Furthermore, plaintiff's implied-warranty claims against Gencor were certainly "connected with any of the transactions which at any time have occurred between [plaintiff and MCAT]," especially given that the same rock classification machine formed the basis of plaintiff's claims against both MCAT and Gencor. In light of the sweeping language contained in the settlement agreement executed by MCAT and plaintiff—which released "any and all actual and potential claims" against "any other person, firm, business entity or corporation charged or chargeable with responsibility which is or may be derivative from [MCAT]"—we conclude that the document was sufficiently broad to release and discharge plaintiff's implied-warranty claims against Gencor. *Meridian Mut Ins Co v Mason-Dixon Lines, Inc (On Remand)*, 242 Mich App 645, 649-650; 620 NW2d 310 (2000); *Romska v Opper*, 234 Mich App 512, 515-516; 594 NW2d 853 (1999); see also *Dresden v Detroit Macomb Hosp Corp*, 218 Mich App 292, 298; 553 NW2d 387 (1996); *Skotak v Vic Tanny Int'l, Inc*, 203 Mich App 616, 619; 513 NW2d 428 (1994).

V

In light of our conclusions, we need not address the remaining arguments raised by the parties on appeal.

Reversed and remanded for entry of judgment in favor of Gencor. We do not retain jurisdiction. As the prevailing party, Gencor may tax costs pursuant to MCR 7.219.

MARKEY, J., concurred.

HOEKSTRA, J. *(concurring)*. Because MCR 7.215(J) requires me to follow *Romska v Opper*, 234 Mich App 512; 594 NW2d 853 (1999), in which this Court adopted the flat-bar rule, I concur with the result reached by the majority. For the reasons stated in my dissent in *Romska*, I am convinced that the intent rule is the better-reasoned rule and the rule most consistent with Michigan caselaw and statutes. Here, it is apparent from the circumstances that Heritage did not intend for its settlement agreement with Michigan Tractor & Machinery Company to release and discharge its implied warranty claims against Gencor Industries, Inc. In all other aspects, I agree and join with the majority.