GUARANTEED CONSTRUCTION COMPANY v GOLD BOND
PRODUCTS

Docket No. 81772. Submitted February 6, 1986, at Detroit. Decided
July 21, 1986.

Plaintiff, Guaranteed Construction Company, contracted with the
Ingham County Housing Commission to refurbish the Carriage
Lane Apartments in Okemos. Plaintiff subcontracted parts of
the project to Formation Plaster, Inc., including the installation
of corner bead, a light gauge piece of metal usually coated with
zinc that protects the outer corner of a wall and is used in
association with dry wall. After the corner bead was installed,
a dry wall joint compound or mud was smoothed over joints in
the dry wall and around the corner bead to create the look of a
plaster wall, which was then painted. Formation's superinten-
dent thereafter discovered that the mud had crumbled and the
corner bead underneath it had corroded extensively. As a
result, plaintiff had to replace the corner bead and mud and
repaint the affected apartment units. Plaintiff thereafter filed
suit in the Oakland Circuit Court against Gold Bond Products,
Dale Industries, Sharon Steel Corp., Westphalia Building Prod-
ucts, Triumph Metal Source, and Formation Plaster, Inc. Gold
Bond manufactured and sold the dry wall joint compound to
Westphalia, which supplied it to Formation. Sharon Steel and
Triumph sold steel to Dale Industries, which in turn con-
structed and sold the corner bead to Formation. Plaintiff's
complaint alleged: (1) defective product, (2) breach of express
and implied warranty, (3) failure to warn, and (4) negligent
design and manufacture. The circuit court, Robert C. Anderson,
J., on defendants' motion, granted summary judgment in favor
of defendants, ruling that there was no genuine issue as to any
material fact and that defendants were entitled to judgment as
a matter of law. Plaintiff appealed claiming error in the circuit

REFERENCES

Am Jur 2d, Constitutional Law §§ 747 *et seq.*

Am Jur 2d, Elections §§ 204 *et seq.,* 328 *et seq.*

Am Jur 2d, Municipal Corporations, Counties, and Other Political
Subdivisions §§ 126 *et seq.*

See the annotations in the ALR3d/4th Quick Index under Ballots;
Elections.

court's grant of summary judgment, contending that material factual issues existed relative to its claims of breach of warranty and failure to warn. *Held:*

1. The record did not indicate that express warranties that the corner bead would not rust were made, much less breached.

2. Plaintiff failed to allege or show that it relied on any of the defendants to select or furnish suitable materials or that defendants knew that plaintiff would have the corner bead installed and the mud applied under extremely humid conditions. The implied warranty of fitness for a particular purpose therefore did not apply in this case.

3. Plaintiff, by having the corner bead installed and the mud applied under extremely humid conditions, did not use the corner bead and mud for the ordinary purposes for which they are used. In addition, plaintiff failed to prove that the products were defective when they left the hands of the manufacturers or sellers. No factual development could therefore justify a recovery by plaintiff on the basis of a claimed breach of the implied warranty of merchantability and the circuit court did not err in granting summary judgment in favor of defendants on that claim.

4. Defendants owed no duty to warn plaintiff and Formation, experts in the construction industry, that use of the corner bead and mud in highly humid conditions could cause corrosion. Defendants were entitled to assume that plaintiff and Formation were knowledgeable and had mastery over basic operations in gypsum dry wall construction.

Affirmed.

1. Mᴏᴛɪᴏɴs ᴀɴᴅ Oʀᴅᴇʀs — Sᴜᴍᴍᴀʀʏ Jᴜᴅɢᴍᴇɴᴛ — Issᴜᴇ ᴏғ Mᴀᴛᴇ-
    ʀɪᴀʟ Fᴀᴄᴛ — Aᴘᴘᴇᴀʟ — Cᴏᴜʀᴛ Rᴜʟᴇs.

    A pretrial motion for summary judgment on the ground that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law may not be granted unless the trial court, after giving the benefit of any reasonable doubt to the nonmoving party, concludes that there is no genuine issue as to any material fact; on appeal, the Court of Appeals will affirm a trial court's grant of such a motion only if no factual development could possibly justify recovery by the nonmoving party (GCR 1963, 117.2[3], now MCR 2.116[C][10]).

2. Sᴀʟᴇs — Uɴɪғᴏʀᴍ Cᴏᴍᴍᴇʀᴄɪᴀʟ Cᴏᴅᴇ — Wᴀʀʀᴀɴᴛʏ ᴏғ Mᴇʀᴄʜᴀɴᴛ-
    ᴀʙɪʟɪᴛʏ.

    A seller of goods creates an express warranty of merchantability where he sets forth a promise or affirmation, description, or

sample with the intent that the goods will conform to the affirmation or promise (MCL 440.2313; MSA 19.2313).

3. SALES — UNIFORM COMMERCIAL CODE — WARRANTY OF MERCHANTABILITY.

A warranty that the goods shall be merchantable is implied in a contract for sale where the seller is a merchant with respect to goods of the kind sold (MCL 440.2314; MSA 19.2314).

4. SALES — UNIFORM COMMERCIAL CODE — WARRANTY OF MERCHANTABILITY — WARRANTY OF FITNESS.

A warranty of merchantability warrants that goods sold by a merchant are of average quality within the industry, whereas a warranty of fitness for a particular purpose warrants that the goods are fit for the purpose for which they were intended and for this warranty to be implied the seller must know, at the time of the sale, the particular purpose for which the goods are intended and that the buyer is relying on the seller to select or furnish suitable goods (MCL 440.2314, 440.2315; MSA 19.2314, 19.2315).

5. SALES — UNIFORM COMMERCIAL CODE — WARRANTY OF MERCHANTABILITY.

A buyer of goods, to establish a prima facie case of breach of an implied warranty of merchantability, must show that the goods were defective when they left the possession of the manufacturer or seller; a defect is established by proof that the goods were not reasonably fit for their intended, anticipated or reasonably foreseeable use (MCL 440.2314; MSA 19.2314).

6. SALES — UNIFORM COMMERCIAL CODE — WARRANTY OF MERCHANTABILITY.

The implied warranty of merchantability does not apply where the buyer uses the goods in a manner other than intended (MCL 440.2314; MSA 19.2314).

7. PRODUCTS LIABILITY — MANUFACTURERS AND SELLERS — DUTY TO WARN CONSUMERS — QUESTION OF LAW.

Manufacturers and sellers of products may be subject to liability for failure to warn purchasers or users of their products about a risk that is related to the intended and reasonably foreseeable uses of their products; the question of whether any duty to warn is owed is one of law for the court to decide.

*Honigman, Miller, Schwartz & Cohn* (by *Norman C. Ankers*), for plaintiff.

.

*Barbier, Goulet, Petersmarck, Tolleson, Mead & Paige, P.C.* (by *Daniel C. Symonds* and *Thomas H. Hill*), for Gold Bond Products and Westphalia Building Products.

*Sommers, Schwartz, Silver & Schwartz, P.C.* (by *Leonard Schwartz*), for Dale Industries.

*Beresh & Prokopp* (by *David G. Sekerak*), for Sharon Steel Corporation.

*Harvey, Kruse, Westen & Milan, P.C.* (by *Larry W. Davidson*), for Triumph Metal Source.

Before: BEASLEY, P.J., and GRIBBS and M. H. CHERRY,* JJ.

GRIBBS, J. Plaintiff, Guaranteed Construction Company, appeals from the trial court's grant of summary judgment to defendants Gold Bond Products, Dale Industries, Sharon Steel, Westphalia Building Products, and Triumph Metal Source.[1]

In 1979, Guaranteed contracted with the Ingham County Housing Commission to refurbish the Carriage Lane Apartments in Okemos. The architect, Warren Holmes-Kenneth Black Company of Lansing, supplied specifications for the project. Guaranteed subcontracted portions of the project to Formation Plaster, Inc. Gold Bond manufactured and sold dry wall joint compound to Westphalia; Westphalia was a supplier of the joint compound; Dale sold steel corner bead to Formation; and Sharon and Triumph sold steel to Dale which was used to construct the steel corner bead.

Formation installed the corner bead at the proj-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] After the trial court granted summary judgment to appellees, plaintiff agreed to dismissal of its complaint against defendant Formation Plaster, Inc., without prejudice.

ect site, pursuant to the architect's specifications. Corner bead is a light gauge piece of metal usually coated with zinc. It protects the outer corner of a wall, and is used in association with dry wall. After corner bead is installed, a dry wall joint compound or mud is smoothed over joints in the dry wall and around the corner bead to create the look of a plaster wall. The wall is then painted or wallpapered. The dispute in this case arose because, after the corner bead was installed, the mud was applied and the dry wall was painted, Formation's superintendent, Ismael Calderon, discovered that the mud had crumbled and the corner bead underneath it had corroded extensively. As a result, Guaranteed had to replace the corner bead and mud and repaint the affected units.

On appeal, Guaranteed argues that the trial court erred when it granted defendants' motions for summary judgment, because there were genuine issues of material fact. We disagree.

A pretrial motion for summary judgment brought under GCR 1963, 117.2(3), now MCR 2.116(C)(10), may not be granted unless the trial court, after giving the benefit of any reasonable doubt to the party opposing the motion, concludes that there is no genuine issue as to any material fact, *Michigan Mutual Ins Co v Heatilator Fireplace,* 422 Mich 148, 153; 366 NW2d 202 (1985). We affirm the trial court's grant of such a motion only if no factual development could possibly justify recovery by the nonmoving party, *League Life Ins Co v White,* 136 Mich App 150, 152; 356 NW2d 12 (1984).

Plaintiff's complaint contained four counts: (1) defective product; (2) express and implied warranty; (3) failure to warn; and (4) negligent design and manufacture. In this appeal, plaintiff argues that there were material factual issues only as to

the claims of warranty and failure to warn. Consequently, we address only those claims.

Count II of plaintiff's complaint alleges that defendants expressly and impliedly warranted that the products they manufactured, used and sold would be merchantable and fit for the ordinary purposes for which they were intended, including Guaranteed's use of the products. Plaintiff alleged that, "Gold Bond, Dale, Sharon, Formation and Westphalia breached their warranties of merchantability and fitness, in that, among other things, soon after the application and installation of the corner bead and dry wall compound, the corner bead corroded extensively, requiring replacement by Guaranteed."

First, we note that plaintiff has not properly presented a claim based on express warranty. An express warranty is created by a seller by setting forth a promise or affirmation, description, or sample with the intent that the goods will conform, *Latimer v William Mueller & Son, Inc,* 149 Mich App 620, 630; 386 NW2d 618 (1986). See *Klanseck v Anderson Sales & Service, Inc,* 136 Mich App 75, 86-87; 356 NW2d 275 (1984), lv gtd 422 Mich 936 (1985), MCL 440.2313; MSA 19.2313. Plaintiff contends that the packages which Dale sold to it carried the description "corner bead" on them, and that this created express warranties in favor of it. See White & Summers, Uniform Commercial Code (2d ed), § 9-3, pp 328-332. It is clear that Dale did supply "corner bead." If Dale's packaging had said "non-corrosive corner bead," then plaintiff's assertion might have merit. However, in this case, plaintiff has not pointed to any representation by the seller that the corner bead would not rust. See *Klanseck, supra; Latimer, supra.* Consequently, if plaintiff is to recover on a warranty theory, it will have to rely on an implied warranty.

MCL 440.2314; MSA 19.2314 provides:

> (1) Unless excluded or modified (section 2316), *a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.* Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
>
> (2) Goods to be merchantable must be at least such as
>
> (a) pass without objection in the trade under the contract description; and
>
> (b) in the case of fungible goods, are of fair average quality within the description; and
>
> (c) are fit for the ordinary purposes for which such goods are used; and
>
> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
>
> (e) are adequately contained, packaged, and labeled as the agreement may require; and
>
> (f) conform to the promises or affirmations of fact made on the container or label if any.
>
> (3) Unless excluded or modified (section 2316) other implied warranties may arise from course of dealing with or usage of trade. [Emphasis added.]

A warranty that the goods shall be merchantable is implied in a contract for sale if the seller is a merchant with respect to goods of that kind, MCL 440.2314; MSA 19.2314.

MCL 440.2315; MSA 19.2315 provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied

warranty that the goods shall be fit for such purpose.

The warranty of merchantability requires that the goods sold be of average quality within the industry. A warranty of fitness for a particular purpose requires that the goods sold be fit for the purpose for which they are intended; in order to take advantage of this type of warranty, the seller must know, at the time of sale, the particular purpose for which the goods are required and also that the buyer is relying on the seller to select or furnish suitable goods. *Ambassador Steel Co v Ewald Steel Co,* 33 Mich App 495, 501; 190 NW2d 275 (1971), lv den 386 Mich 754 (1971); *Bosway Tube & Steel Corp v McKay Machine Co,* 65 Mich App 426; 237 NW2d 488 (1975), lv den 397 Mich 817 (1976).

In this case, plaintiff has neither alleged nor shown that plaintiff relied on any of the sellers to select or furnish suitable materials or that any of the sellers knew the particular purposes the goods would be used for. Consequently, plaintiff cannot rely on the implied warranty of fitness for a particular purpose. Essentially, plaintiff's claim is that defendants breached the implied warranty of merchantability set out at MCL 440.2314; MSA 19.2314.

To establish a prima facie case of breach of implied warranty, a plaintiff must show that goods were defective when they left the possession of the manufacturer or seller, *Kupkowski v Avis Ford, Inc,* 395 Mich 155, 165-166; 235 NW2d 324 (1975). Under implied warranty theory, a defect is established by proof that a product is not reasonably fit for its intended, anticipated or reasonably foreseeable use, *Elsasser v American Motors Corp,* 81 Mich App 379, 384; 265 NW2d 339 (1978). Mer-

chantable is not a synonym for perfect, White & Summers, *supra,* § 9-7, p 356. The warranty of merchantability is that goods are of average quality in the industry, *Bosway Tube & Steel Corp, supra,* p 431. When goods are used in a manner other than intended, no warranty applies, *Grant v National Acme Co,* 351 F Supp 972, 977-978 (WD Mich, 1972). As to goods accepted, the burden is on the buyer to establish any claimed breach of warranty, MCL 440.2607(4); MSA 19.2607(4).

We conclude that no factual development could justify a recovery by Guaranteed against any of the defendants because the corner bead and mud were installed in a highly humid environment, which is not an ordinary purpose for which such goods are used. In addition, Guaranteed has failed to bring forth any evidence indicating that the products were defective when they left the hands of the manufacturers or sellers. Consequently, there was no material issue of fact, and the trial judge properly granted defendants' motion for summary judgment on the claim that defendants breached an implied warranty of merchantability.

Ismael Calderon, Formation's superintendent on the Carriage Lanes project, testified in deposition that it was hot inside the building during installation of the corner bead and mud. Paul Hengesbach, co-owner of Westphalia, stated that when he visited the Carriage Lane apartment project it was humid and the humidity was aggravated by a broken water main on the construction site. John Fitzgerald, plaintiff's expert witness, stated that, when the dry wall was installed, it was highly humid, which he defined as in the eighty to ninety percent bracket. Calderon indicated that the Carriage Lanes project had numerous water and moisture problems, including a leaking roof. Guaranteed has admitted that daily reports contained

entries such as the following: "work or materials unsatisfactory" wherein it was observed "water penetration of Coping must be addressed"; "roof leak damaged dry wall"; heavy rain caused "considerable water penetration"; "Moisture in building has been a problem. Windows are being closed at night now and open during dry days." A meeting was scheduled to address problems with water collecting on the roof and leaks in the roof.

A report of a monthly progress meeting held on August 11, 1980, indicates that Calderon was concerned about several acoustic ceiling panels which had warped due to excessive moisture. It was also noted in the report that there was considerable water penetration on the first-floor apartments in the east wing of the complex. Guaranteed stated that it took three to fourteen days for the mud to dry when placed on the corner bead. Several witnesses testified in deposition that the normal drying time of mud is twenty-four hours. Plaintiff's expert in corrosion engineering, John Fitzgerald, indicated in deposition that the Gold Bond mud was supposed to dry in twenty-four hours. However, he indicated that under high humidity there may be a delayed drying time. He further stated that with a latex product such as mud, the outside may appear dry but it may not have properly dried throughout.

Fitzgerald conducted several tests of Dale corner bead, other corner bead used in the industry, and various types of mud. According to his report and that of his consultant, he tested corner bead produced by Phillips, US Gypsum, and Bostitch, as well as Dale. He applied Gold Bond mud to all of these corner beads. The report indicates that the corner bead samples "did not have any significant variations in commercial quality." Further testing indicated that when Dale corner bead and Gold

Bond mud were used in an ambient atmosphere, with little humidity, no rusting occurred after ten days. However, when they were placed in a room with ninety-five percent humidity, rusting and corrosion occurred. Fitzgerald's testing revealed that Dale corner bead was less resistant to corrosion than Gold Bond corner bead (manufactured by National Gypsum), but that there was no significant difference between Dale and other corner beads, including Phillips, US Gypsum, and Bostitch. Dale corner bead had the same thickness of galvanizing as Phillips, US Gypsum, and Bostitch. Fitzgerald also determined that the Gold Bond mud had a slightly higher chloride content, making it more aggressive. Fitzgerald was of the opinion that the cause of the corrosion was the use of a more aggressive compound with a less rust-resistant corner bead, applied in a humid environment.

Fitzgerald stated in deposition that the high humidity contributed to the problem and that, absent such high humidity, Guaranteed would never have had a corrosion problem. Fitzgerald was of the opinion that using the Gold Bond mud in conjunction with any of the other corner beads in highly humid conditions would have caused them to rust. He testified that, in his opinion, the cause of the damage to the gypsum dry wall system was probably not the Gold Bond joint compound.

The uncontroverted affidavits of Jay Tate and William Johnston were submitted by defendants. According to Jay Tate, it is "common knowledge in the dry wall construction and gypsum construction industry, amongst qualified installers of corner bead and joint compound, that even galvanized steel will rust in the face of delayed drying time. . . ." The affidavit of William Johnston indicated that a mud was available which would chemically

set within hours, even in the presence of high moisture and humidity, and that accelerators were available, which would shorten the drying time of chemically setting mud. According to the Johnston affidavit, the availability and use of these chemically setting muds was well known in the gypsum dry wall construction industry in 1980.

Ismael Calderon agreed with statements taken from the gypsum construction handbook, which is a recognized standard in the industry, that sustained high humidity increases chances for galvanized steel components to rust and that high humidity can cause insufficient drying time between coats leading to bond failure. Calderon stated that high humidity was an unfavorable job condition and that something should have been done about it. He further stated that if the mud had not dried in twenty-four hours, something should have been done about it. Calderon stated that fans were used at the job site during a one-week period when a water pipe burst in the basement, causing the basement to flood. However, this was done in November of 1980, after the discovery of the corrosion problem. Plaintiff's expert, Fitzgerald, agreed that sustained high humidity would increase the chances for galvanized steel, such as corner bead, to rust.

We conclude that plaintiff has failed to raise a material issue of fact that a defect attributable to any of the defendants was a cause of the corrosion. The mud and corner bead were of average quality in the industry and reasonably fit for their intended, anticipated, or reasonably foreseeable uses. See *Bosway Tube & Steel Corp, supra; Elsasser, supra.* Therefore, plaintiff has failed to establish a prima facie case of breach of an implied warranty. Furthermore, it is not disputed that it was well known in the industry that under moist and hu-

mid conditions, chemically setting mud and accelerators should be used to ensure that the mud will dry in a reasonable time. Plaintiff's use of the Gold Bond mud along with the corner bead in highly humid conditions was not an intended use of these products. Plaintiff's expert's own tests indicated that Dale corner bead and Gold Bond mud did not rust in nonhumid conditions. Thus, when used for their intended purposes, these products were merchantable. As to defendants Sharon and Triumph, plaintiff has not presented any evidence or testimony which would indicate that the steel was defective when it left their hands. These defendants supplied Dale with standard coat steel, which was then manufactured into corner bead. Plaintiff failed to bring forth any evidence which would create a material issue of fact that a defect was attributable to Sharon or to Triumph. Consequently, the trial judge properly granted defendants' motions for summary judgment.

Plaintiff also contends that defendants failed to warn it that the use of their products in highly humid conditions could cause corrosion. Manufacturers and sellers of products may be subject to liability for failure to warn purchasers or users of their products about a risk that is related to the intended and reasonably foreseeable uses of their products. *Antcliff v State Employees Credit Union,* 414 Mich 624, 637; 327 NW2d 814 (1982), reh den 417 Mich 1103 (1983); *Trotter v Hamill Mfg Co,* 143 Mich App 593, 599; 372 NW2d 622 (1985). The question of whether any duty to warn is owed is one of law for the court to decide. *Trotter, supra,* p 600; *Antcliff, supra,* p 640. In *Antcliff, supra,* pp 640-641, the Supreme Court held that a manufacturer and seller of power scaffolds did not owe a duty to warn or instruct experienced and knowledgeable painters in safe scaffold rigging. It was

further stated that a manufacturer should be able to presume mastery of basic operations by experts or professionals in the industry. *Antcliff, supra,* p 640.

In *Antcliff,* plaintiff was a journeyman painter who was injured in a fall from a scaffold. The evidence revealed that the contractual relationship between the seller and buyer was that of "a manufacturer which had designed a product line for professional riggers, doing business with professional riggers." *Antcliff, supra,* p 634. The scaffold in *Antcliff* was not defective. The manner in which the product was used, however, resulted in damage. The *Antcliff* Court looked to the skill and experience of the buyers and ultimate users and held that the seller did not have a duty to provide information on how to safely rig its product.

In the present case, Ismael Calderon, Formation's superintendent at the construction site, testified that he had worked in dry wall construction as a subcontractor since 1964. He had been employed by Formation for four or five years. Calderon's testimony indicated that he was extremely knowledgeable about the construction of dry wall. Guaranteed admitted that Calderon was experienced and knowledgeable in the area of dry wall construction through the use of corner bead. Calderon agreed that sustained high humidity would increase the chance of galvanized steel components to rust. He further stated that high humidity would be an unfavorable job condition that should be corrected.

The affidavit of William Johnston establishes that in 1980 there were two types of joint compounds available. One product was known as a setting mud which chemically set and could dry within hours in the presence of high moisture and humidity. The availability of these chemically set-

ting muds and accelerators to shorten the drying time was published and well known within the gypsum dry wall construction industry prior to 1980. The affidavit of Jay Tate indicates that, under conditions of delayed drying time, even galvanized steel will rust, and that it was "not the standard or practice in the corner bead industry to give warnings in regard thereto as the same was common knowledge." Those affidavits are uncontroverted.

We conclude that defendants did not owe a duty to warn Guaranteed and Formation, experts in the construction industry, that use of their products in highly humid conditions could cause corrosion. Defendants were entitled to assume that Guaranteed and Formation were knowledgeable and had mastery over the basic operations in gypsum dry wall construction. See *Antcliff, supra,* pp 640-641.

Affirmed.