*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WHITE ACRES, LLC, H&H TURKEY FARMS, CROCKERY CREEK TURKEY FARMS, LLC, HIGH LEAN PORK, INC., GREAT LAKES PORK, INC., HURON PORK, LLC, FARM BUREAU MUTUAL INSURANCE COMPANY OF MICHIGAN, SIETSEMA FARMS FEEDS, LLC, NATIONWIDE AGRIBUSINESS INSURANCE COMPANY, and FRANKENMUTH INSURANCE COMPANY,

        Plaintiffs-Appellants,

v

SHUR-GREEN FARMS, LLC, SUPERIOR FEED INGREDIENTS, LLC, RESTAURANT RECYCLING, LLC, HERITAGE INTERACTIVE SERVICES, LLC, and GLYCERIN TRADERS, LLC,

        Defendants,

and

ZOETIS OF DELAWARE, INC.,

        Defendant-Appellee.

UNPUBLISHED
September 15, 2022

No. 354175
Kent Circuit Court
LC No. 15-007614-CB

Before: GADOLA, P.J., and SWARTZLE and CAMERON, JJ.

PER CURIAM.

    In this negligence action, plaintiffs alleged defendant, Zoetis of Delaware, Inc. (Zoetis), was liable for damages caused by the introduction of a substance called Lascadoil into animal

feed.[1] Plaintiffs later moved to amend their complaint against Zoetis to include a claim for breach of an implied warranty of merchantability. The trial court granted summary disposition to Zoetis under MCR 2.116(C)(10) and denied plaintiffs' motion to amend. Plaintiffs moved for reconsideration, which the trial court also denied. Plaintiffs appeal to this Court as of right. We affirm.

## I. BACKGROUND

In 2014, Lascadoil—an oil not fit for human or animal consumption—was improperly introduced into animal feed given to turkeys and hogs, killing thousands of turkeys and requiring the quarantining of thousands of hogs. The Lascadoil originated with Zoetis, as a waste byproduct from Zoetis's production of an animal pharmaceutical called Lasalocid Sodium. Although a waste byproduct, Zoetis sells Lascadoil because it is suitable for use as a biofuel.

The chain from Zoetis's production of Lascadoil to its introduction into animal feed is a long one. Following Zoetis's production process, ownership of the Lascadoil passed between several corporate entities—(1) Heritage Interactive Services, LLC (Heritage), (2) Shur-Green Farms, LLC (Shur-Green), (3) Glycerin Brokers, LLC (Glycerin), (4) Superior Feed Ingredients, LLC (Superior Feed), and (5) Restaurant Recycling, LLC (Restaurant Recycling)—before being added to animal feed by Sietsema Farms Feeds, LLC (Sietsema). Notably, when selling the Lascadoil to Heritage, Zoetis undisputedly informed Heritage of its limited uses and provided Heritage with safety information about Lascadoil. Indeed, the contract between Zoetis and Heritage set forth the limited uses for Lascadoil and provided that Heritage could only use or resell Lascadoil for "non-food" purposes or as a "fuel." It is also undisputed that this safety information was given to the next entity in the chain, Shur-Green, which entered into a contract with Heritage. However, at some point in the supply chain, there was a breakdown in communication, and the limited use and the risks of Lascadoil were not conveyed down the chain. An investigation by the United States Food and Drug Administration (FDA) appeared to place the blame largely on Shur-Green, which received safety information on Lascadoil and its limited uses from entities farther up the supply chain, yet failed to convey this information to customers downstream, instead referring to the product by names such as "soyoil" or "used cooking oil." Ultimately, after the Lascadoil passed through several corporate hands, Sietsema—unaware of Lascadoil's dangers and limited uses—used Lascadoil in animal feed and then sold the contaminated feed to turkey and hog farmers, who fed it to the animals. As a result of the contamination, turkey farms saw higher than normal mortality rates, hogs had to be quarantined, and the farmers suffered considerable economic losses.

---

[1] The Lascadoil contamination prompted several lawsuits in Michigan by animal farmers, the Michigan Turkey Producers Cooperative, Inc., the Michigan Turkey Producers, LLC, Sietsema Farms Feeds, LLC, Restaurant Recycling, LLC, Superior Feed Ingredients, LLC, and insurers for some of the affected parties. The lawsuits, which were consolidated in the trial court, included a variety of claims against various parties, including Zoetis and other entities in the supply chain leading to the contamination. At this juncture, the majority of the claims have been resolved, and for purposes of the current appeal, the issues before us are limited to plaintiffs' claims against Zoetis.

Plaintiffs—the farmers, Sietsema, and their respective insurers—filed suit against Zoetis, alleging that Zoetis was negligent for failing to ensure that Lascadoil did not end up in the animal-feed supply chain. Plaintiffs later moved to amend their complaint to include a claim for breach of an implied warranty of merchantability. The trial court granted summary disposition to Zoetis under MCR 2.116(C)(10), concluding (1) that plaintiffs failed to establish that Zoetis owed or breached a duty as required to support a negligence claim and (2) that the economic loss doctrine barred plaintiffs' tort claim against Zoetis. The trial court also denied plaintiffs' motion to amend, because that amendment would be futile.

## II. SUMMARY DISPOSITION

Plaintiffs contend the trial court erred in granting Zoetis's motion for summary disposition on the basis of the economic loss doctrine. Plaintiffs also argue that the trial court erred when it rejected their negligence claim, concluding Zoetis owed plaintiffs no duty. According to plaintiffs, the trial court should have denied Zoetis's motion for summary disposition because Zoetis owed plaintiffs a legal duty "to keep contaminated soybean oil out of the food chain." We disagree.

### A. STANDARD OF REVIEW

Generally, this Court "review[s] de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019).

> A motion under MCR 2.116(C)(10) . . . tests the factual sufficiency of a claim. When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. [*Id*. at 160 (quotation marks, citations, and emphasis omitted).]

This Court also reviews de novo the interpretation of contracts. *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006). "If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *Cadillac Rubber & Plastics, Inc v Tubular Metal Sys, LLC*, 331 Mich App 416, 422; 952 NW2d 576 (2020) (citation omitted).

### B. ANALYSIS

The trial court granted Zoetis's motion for summary disposition, in part, because "the distribution chain is made up of a series of contractual or quasi-contractual links, and the damages sought by the plaintiffs constitute purely economic losses." The trial court concluded any recovery by plaintiffs was governed by the economic loss doctrine and was therefore limited by the remedies available under the Uniform Commercial Code (UCC). Plaintiffs dispute this conclusion on the bases that (1) there was no transaction between plaintiffs and Zoetis, (2) the claims emanate from a service agreement between Zoetis and Heritage, rather than a sale of goods, and (3) the case should be decided in tort law because it involves a "disaster" outside of contract law rather than a minor defect in quality. These arguments lack merit, and the trial court did not err by concluding that the economic loss doctrine barred plaintiffs' tort claim.

The economic loss doctrine is a judicially-created doctrine, derived from the UCC, which limits tort actions seeking to recover economic damages resulting from commercial transactions. *Quest Diagnostics, Inc v MCI WorldCom, Inc*, 254 Mich App 372, 376; 656 NW2d 858 (2002). The doctrine provides that when "a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the UCC[.]" *Neibarger v Universal Coop, Inc*, 439 Mich 512, 527-528; 486 NW2d 612 (1992). That is, "[i]f a commercial purchaser were allowed to sue in tort to recover economic loss, the UCC would be rendered meaningless and contract law would drown in a sea of tort." *Quest Diagnostics, Inc*, 254 Mich App at 377 (quotation marks and citation omitted). In adopting the economic loss doctrine, the Michigan Supreme Court explained:

> [When] a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only economic losses. This doctrine hinges on a distinction drawn between transactions involving the sale of goods for commercial purposes where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts. [*Neibarger*, 439 Mich at 520-521 (quotation marks and citation omitted).]

Thus, the first issue is whether this case involves the sale of goods for commercial purposes, or the sale of products for use by consumers. This "requires consideration of the underlying policies of tort and contract law as well as the nature of the damages." *Id*. at 531. As explained by this Court, the doctrine applies when the parties to the litigation "were involved, either directly or indirectly, in a transaction for goods," *Quest Diagnostics, Inc*, 254 Mich App at 379, and more specifically, when "(1) the parties or others closely related to them had the opportunity to negotiate the terms of the sale of the good or product causing the injury, and (2) their economic expectations can be satisfied by contractual remedies." *Id*. at 380. However, privity of contract is not required. *Sullivan Indus, Inc v Double Seal Glass Co, Inc*, 192 Mich App 333, 344; 480 NW2d 623 (1991). Instead, the focus is on "the type of loss" the plaintiff is alleging. *Id*. "Allegations of only economic loss do not implicate tort law concerns with product safety, but do implicate commercial law concerns with economic expectations." *Id*.

In this case, plaintiffs seek to recover for economic losses related to the sale of goods between commercial entities for commercial purposes. Zoetis sold the Lascadoil to Heritage, and through a chain of transactions, the Lascadoil became a component part in animal feed purchased by plaintiffs, and plaintiffs now claim that they suffered damages as a result of the defective animal feed. Clearly, there was a sale of goods. See *id*. at 344-345 (defining "goods," consistent with UCC definition, as "all things," including component parts, "which are movable at the time of identification to the contract for sale"). Although plaintiffs emphasize on appeal that they are not in privity with Zoetis, there was nevertheless a chain of commercial transactions in which each commercial purchaser had the ability to negotiate terms and protect itself from economic losses related to the product. See *id*. at 343-344. When, as in this case, "each party in the distribution chain could have protected itself through contract, the [economic loss] doctrine applies in Michigan even if the chain of commercial transactions is a long one." *Crossing at Eagle Pond Apartments, LLC v Lubrizol Corp*, 790 Fed App'x 775, 780 (CA 6, 2019) (quotation marks and citation omitted); see also *Citizens Ins Co v Osmose Wood Preserving, Inc*, 231 Mich App 40, 44;

-4-

585 NW2d 314 (1998) (applying economic loss doctrine to a chain of transactions in which a manufacturer sold chemicals to a company which then used the chemical to treat wood installed in the plaintiff's restaurant). In short, the economic loss doctrine applies to the facts of this case.

Though the trial court granted defendant's motion for summary disposition on the basis of the economic loss doctrine *and* negligence, the latter conclusion was ultimately unnecessary. Again, claims subject to the economic loss doctrine can only be resolved under the UCC and are not considered tortious. *Sullivan Indus, Inc*, 192 Mich App at 344. Because resolution of this case required plaintiffs to make claims under the UCC, which they failed to do, we will not analyze plaintiffs' negligence claim.

Plaintiffs contend that the economic loss doctrine does not apply because plaintiffs' claims did not arise from a sale of goods but from a contract for services—specifically waste management services—between Zoetis and Heritage. While plaintiffs are correct that the economic loss doctrine does not apply when "the claim emanates from a contract for services," *Quest Diagnostics, Inc*, 254 Mich App at 379, plaintiffs are mistaken in their assertion that their claims arise from a service contract. "Michigan applies the predominant factor test to determine whether a contract primarily involves a sale of goods, actionable under the UCC, or a sale of services, actionable under general common-law principles." *Citizens Ins Co*, 231 Mich App at 45 (quotation marks and citation omitted).

> [T]o determine whether contracts for mixed goods and services are governed by the code: The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involve . . . or is a transaction of sale, with labor incidentally involved[.] [*Neibarger*, 439 Mich at 534 (quotation marks and citation omitted).]

The contract between Zoetis and Heritage stated:

> ZOETIS uses soybean oil and other materials in the manufacture and processing of active pharmaceutical ingredients and in pharmaceutical, consumer and animal health products; and,
>
> ZOETIS generates residual materials that are non-hazardous under the federal Resource Conservation and Recovery Act and its implementing regulations, of sufficient quality to be used or reused without further processing or reclamation as an ingredient in an industrial process to make a non-food product, or used or reused as an effective substitute for a commercial non-food product or fuel; and,
>
> ZOETIS desires to contract with [Heritage] for the sale of said residual product; and,
>
> [Heritage] intends to use or resell these residual products as a raw material or fuel to a business or businesses . . . which will use them in industrial process(es).

The contract between Zoetis and Heritage plainly states its purpose was "for the sale of" the Lascadoil, and the presence of any service component in the contract between Zoetis and

Heritage is minimal at best.[2]  The primary purpose of the transaction in this case was the sale of Lascadoil for profit, and any waste collection or waste transportation services were merely incidental to this primary purpose of selling goods.  Cf. *Silicon Intern Ore, LLC v Monsanto Co*, 155 Idaho 538, 546-547; 314 P3d 593 (2013) (concluding that when the waste was processed and sold for profit, the sale of waste from mining operations constituted a sale of goods and not a service contract for processing waste); *Huyler Paper Stock Co v Info Supplies Corp*, 117 NJ Super 353, 360; 284 A2d 568 (1971) (determining that sale of paper waste constituted a sale of goods under the UCC and that any service provided, i.e., the collection of the waste, was merely incidental).[3]  Contrary to plaintiffs' arguments, this case involves the sale of goods subject to the economic loss doctrine.

Plaintiffs also assert that the economic loss doctrine should not apply because the case does not involve a mere contractual disappointment or minor defect in quality, but instead constitutes a "disaster outside of a contract" for which plaintiffs should be allowed to recover in tort.  Plaintiffs' argument in this regard is not particularly well-developed.  To a certain extent, plaintiffs' argument—that they suffered a disaster rather than a minor disappointment—suggests the extent of the harm should preclude application of the economic loss doctrine.  However, when considering the applicability of the economic loss doctrine, the inquiry focuses "not so much on the magnitude or extent of the damage as on the parties involved and the nature of the product's use."  *MASB-SEG Prop/Cas Pool v Metalux*, 231 Mich App 393, 402; 586 NW2d 549 (1998) (quotation marks and citation omitted).  As discussed, the economic loss doctrine applies to this case because this case involves commercial entities engaged in the sale of goods for commercial purposes.

In asserting that the issue is a disaster outside of contract, plaintiffs' argument implies that the losses are not a matter of contract because plaintiffs could not have anticipated Zoetis's purported failure to properly dispose of Lascadoil and the resulting safety hazard caused by the introduction of Lascadoil into the supply chain.  See *id*. at 403 (distinguishing "direct and consequential losses" within the parties' contemplation, which are subject to contract negotiation and remedies, from unforeseeable safety hazards that are resolvable in tort).  Though plaintiffs may not have specifically foreseen the introduction of Lascadoil into the animal feed, the quality and suitability of the animal feed—and its ability to affect the health of the turkey and hogs—were

---

[2] Heritage has attempted to characterize itself as a "broker," but such a description does not accord with the purchase agreement under which Heritage was the "buyer" of Lascadoil.  Further, although Heritage could, and did, resell the Lascadoil, there was no share of profits, payment of commission, or other arrangement that would suggest that Heritage was a mere "broker" rather than the purchaser of Lascadoil.  Cf. *Rathe Salvage, Inc v R Brown & Sons, Inc*, 191 Vt 284, 300; 46 A3d 891 (2012) (concluding that an agreement for sale of scrap metal was a sale of goods and not a service contract for hauler to act as a "middleman" or "broker" when "there was no evidence of any arrangement other than the yard selling scrap to hauler at a price established between them").

[3] "Although nonbinding, authority from other jurisdictions may be considered for its persuasive value."  *Magley v M & W Inc*, 325 Mich App 307, 317 n 5; 926 NW2d 1 (2018).

nevertheless matters within the parties' contemplation when negotiating the sale of animal feed. See *id*. Cf. *Visser v Timberlake Sales, Inc*, unpublished per curiam opinion of the Court of Appeals, issued November 2, 2001 (Docket No. 224424), p 3 ("While plaintiffs undoubtedly did not expect to receive cornstarch unfit for animal consumption, plaintiffs had awareness that the quality of their animals' feed affected the herd's health and ability to produce milk. Thus, the quality of their animals' feed was within plaintiffs' contemplation when they contracted to purchase the cornstarch.");[4] *Citizens Ins Co of Am v Kic Chem, Inc*, unpublished opinion of the United States District Court for the Western District of Michigan, issued April 27, 2007 (Case No. 1:04-CV-385), corrected June 19, 2007 (concluding that a plaintiff, harmed by the receipt of the wrong oil for use in dried fruit production, was subject to economic loss doctrine). Fundamentally, plaintiffs' claim is that they received animal feed unsuitable for animal consumption. Claims that relate to suitability and quality of a product, which result in purely economic losses, are properly redressed through contract. See *Neibarger*, 439 Mich at 531-533; *MASB-SEG Prop/Cas Pool*, 231 Mich App at 403. Accordingly, the trial court did not err by concluding that the economic loss doctrine barred plaintiffs' negligence claim. Having concluded the trial court did not err in granting Zoetis's motion for summary disposition on the basis of the economic loss doctrine, we need not consider plaintiffs' negligence arguments. *Sullivan Indus, Inc*, 192 Mich App at 344.

## III. MOTION TO AMEND

Finally, plaintiffs argue that the trial court abused its discretion by denying plaintiffs' motion to amend their complaint to include a claim for breach of an implied warranty of merchantability. We disagree.

### A. STANDARD OF REVIEW

"A trial court's decision on a motion to amend a complaint is reviewed for an abuse of discretion." *Long v Liquor Control Comm*, 322 Mich App 60, 67; 910 NW2d 674 (2017). "An abuse of discretion occurs when the trial court's decision falls outside the range of principled outcomes." *Cox v Hartman*, 322 Mich App 292, 298; 911 NW2d 219 (2017). We review de novo questions involving the interpretation of a contract and the creation of a warranty. *Magley v M & W Inc*, 325 Mich App 307, 313; 926 NW2d 1 (2018); *Heritage Resources, Inc v Caterpillar Fin Servs Corp*, 284 Mich App 617, 632; 774 NW2d 332 (2009); *Kloian*, 273 Mich App at 452.

### B. ANALYSIS

When a trial court grants summary disposition under MCR 2.116(C)(10), the trial court "shall give the parties an opportunity to amend their pleadings as provided by MCR 2.118, unless the evidence then before the court shows that amendment would not be justified." MCR 2.116(I)(5). Leave to amend should be freely granted and may ordinarily be denied only for particularized reasons, including futility. *Wormsbacher v Seaver Title Co*, 284 Mich App 1, 8;

---

[4] Although unpublished opinions are not binding on this Court, they may be considered instructive or persuasive. MCR 7.215(C)(1); *Usitalo v Landon*, 299 Mich App 222, 227 n 1; 829 NW2d 359 (2012).

772 NW2d 827 (2009). Relevant to this case, an amendment will be considered futile if the proposed claim is legally insufficient on its face. *Id*. at 8-9.

With regard to implied warranties, this Court has explained:

Every contract for the sale of goods under Article 2 of the [UCC] includes implied warranties of merchantability and fitness for a particular purpose. The warranty of merchantability requires that the goods sold be of average quality within the industry. A warranty of fitness for a particular purpose requires that the goods sold be fit for the purpose for which they are intended. A seller may, however, disclaim either implied warranty, provided that certain statutory requirements are met. Whether a warranty was effectively disclaimed is a question of law for this Court. [*Vanalstine v Land O'Lakes Purina Feeds, LLC*, 326 Mich App 641, 650-651; 929 NW2d 789 (2018) (quotation marks and citations omitted; alteration in original).]

However, "[w]hen a sophisticated purchaser knows of the dangerous characteristics of a product, no implied warranty of merchantability arises." *Jodway v Kennametal, Inc*, 207 Mich App 622, 631; 525 NW2d 883 (1994). Additionally, "[w]hen goods are used in a manner other than intended, no warranty applies[.]" *Guaranteed Constr Co v Gold Bond Prods*, 153 Mich App 385, 393; 395 NW2d 332 (1986). If there is an implied warranty, it arises at the time the product is sold to the purchaser, and the warranty then runs from the purchaser to the ultimate user. *Jodway*, 207 Mich App at 630-631. By the same token, a "remote purchaser" "can acquire no greater implied-warranty rights from the manufacturer than the original purchaser can." *Heritage Resources, Inc*, 284 Mich App at 641. If a warranty is disclaimed by the manufacturer in the transaction with the initial purchaser, that disclaimer also runs to the remote purchaser. *Id*.

In selling Lascadoil to Heritage, Zoetis sold a product that was not fit for human or animal consumption. The contract between Zoetis and Heritage stated the Lascadoil should be used only for nonfood purposes. Specifically, the recitals of the agreement stated, in part, that the Lascadoil is "of sufficient quality to be used or reused without further processing or reclamation as an ingredient in an industrial process to make a non-food product, or used or reused as an effective substitute for a commercial *non-food product or fuel*." (Emphasis added.) The contract contained Heritage's express agreement it would only resell the materials "as ingredients in an industrial process to make *a non-food product*, or as an effective substitute for commercial products *or fuel* . . . ." (Emphasis added.) The agreement also contained a disclaimer of implied warranties, which stated:

6. EXCEPT AS MAY BE EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, ZOETIS MAKES NO REPRESENTATION REGARDING THE RESIDUAL PRODUCTS, AND MAKES NO GUARANTEE OR WARRANTY OF ANY NATURE, EXPRESS OR IMPLIED. WITHOUT LIMITING THE FOREGOING, SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY AS TO MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE RESIDUAL PRODUCTS OR ANY PART THEREOF.

As discussed, Zoetis also provided Heritage with the Material Safety Data Sheet, which detailed the Lascadoil's properties, reiterated that its only permissible use was as a "fuel," and contained a safety warning about the Lascadoil to the effect that it was *not* for consumption.

On these facts, the trial court did not abuse its discretion by denying plaintiffs' motion to add a claim for breach of an implied warranty for merchantability because any such claim would have been futile. Heritage is an environmental firm, which had been fully informed of the dangers of Lascadoil and its limited uses. Heritage cannot plausibly claim that an implied warranty of merchantability existed to guarantee against Lascadoil's known dangers or that Lascadoil was warrantied as suitable for use as "soyoil" in the feed industry. See *Jodway*, 207 Mich App at 630-631. It also follows that plaintiffs—as remote purchasers who obtained no greater warranty rights than Heritage—cannot claim that Zoetis made such implied warranties. See *Heritage Resources, Inc*, 284 Mich App at 641. Indeed, on the undisputed facts of this case, it is clear that any harm arose because Lascadoil was not used for its intended purpose, and a warranty does not arise in these circumstances. See *Guaranteed Constr Co*, 153 Mich App at 393-397.

The conclusion that Zoetis cannot be held liable for a breach of implied warranty is bolstered by the unequivocal disclaimer in the contract between Heritage and Zoetis, which disclaimed any warranties of merchantability or fitness for a particular purpose. The requirements for a valid disclaimer of implied warranties under the UCC are set forth in MCL 440.2316(2), which states:

> [T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

Consistent with these requirements, the disclaimer in Zoetis's agreement with Heritage is in writing and conspicuously set forth in all capital letters. See MCL 440.1201(2)(j) (defining "conspicuous" to include language "in larger type than the surrounding text, or in contrasting type, font, or color to surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language"). Further, in disclaiming implied warranties, the provision specifically refers, by name, to both the warranty of merchantability and the warranty for suitability or fitness for a particular purpose. See MCL 440.2316(2). In other words, as required by the UCC, "[t]he appropriate terms are used, the operative language is clear and in writing, and the format makes the disclaimers conspicuous." *Vanalstine*, 326 Mich App at 652. The disclaimer satisfies MCL 440.2316(2), and Zoetis's disclaimer of these implied warranties runs to remote or indirect purchasers, such as plaintiffs. See *Vanalstine*, 326 Mich App at 651; *Heritage Resources, Inc*, 284 Mich App at 641.

In sum, given that Zoetis's sale to Heritage involved a material Heritage knew had certain dangers and was suitable only for limited purposes, there was no implied warranty of merchantability that the Lascadoil was of the expected quality of used "soyoil" and there was no implied warranty that it was suitable for use in animal feed. Moreover, the disclaimer in Zoetis's agreement with Heritage complied with MCL 440.2316(2), and this disclaimer applies to remote

purchasers such as plaintiffs. Absent an applicable implied warranty, and given the effective disclaimer of any such potential warranty, Zoetis cannot have breached an implied warranty. See *Vanalstine*, 326 Mich App at 653. Consequently, plaintiffs' claim for breach of an implied warranty is futile, and the trial court did not abuse its discretion by denying plaintiffs' motion to amend to add a futile claim. See *Wormsbacher*, 284 Mich App at 8.

Rather than address Zoetis's contract with Heritage and Zoetis's disclaimer, plaintiffs focus their appellate argument on the disclaimer contained in the agreement between Heritage and Shur-Green. Plaintiffs' discussion of whether Heritage disclaimed implied warranties in its agreement with Shur-Green is immaterial to Zoetis's liability. Certainly, remote purchasers can bargain for additional implied warranties from an intermediary, but those warranties are additional contractual rights between the remote purchaser and the direct purchaser. See *Vanalstine*, 326 Mich App at 651. The fact remains that in seeking to hold *Zoetis* liable for breach of an implied warranty, plaintiffs are limited to what Zoetis, as the manufacturer, and Heritage, as the direct purchaser, negotiated. See *id*. For the reasons discussed, implied warranties did not arise at the time of Zoetis's sale to Heritage, and in any event, all implied warranties of merchantability or fitness for a particular purpose were effectively disclaimed by Zoetis under MCL 440.2316(2). Plaintiffs' discussion of Heritage's contract with Shur-Green and Heritage's disclaimer has no bearing on plaintiffs' claims against Zoetis.

Finally, in their discussion of Heritage's disclaimer, plaintiffs assert that the disclaimer is unconscionable. Again, plaintiffs' focus on Heritage's disclaimer is misplaced with regard to their claims against Zoetis. Regardless, to the extent that plaintiffs assert that it is unconscionable to allow Zoetis to disclaim implied warranties, their argument lacks merit.

With regard to unconscionability, the UCC states:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result. [MCL 440.2302(1).]

As plainly stated in the statute, the question is whether the contract was "unconscionable at the time it was made." *Davis v LaFontaine Motors, Inc*, 271 Mich App 68, 80; 719 NW2d 890 (2006). Unconscionability requires both substantive and procedural unconscionability, and the issue of unconscionability poses a question of law for the court to decide. *Clark v DaimlerChrysler Corp*, 268 Mich App 138, 143; 706 NW2d 471 (2005).

> In order for a contract or contract provision to be considered unconscionable, both procedural and substantive unconscionability must be present. Procedural unconscionability exists where the weaker party had no realistic alternative to acceptance of the term. If, under a fair appraisal of the circumstances, the weaker party was free to accept or reject the term, there was no procedural unconscionability. Substantive unconscionability exists where the challenged term is not substantively reasonable. However, a contract or contract provision is not invariably substantively unconscionable simply because it is

foolish for one party and very advantageous to the other. Instead, a term is substantively unreasonable where the inequity of the term is so extreme as to shock the conscience. [*Id*. at 143-144 (quotation marks and citations omitted).]

Plaintiffs' claim of unconscionability ultimately fails. Substantively, there is nothing conscience shocking in Zoetis's disclaimer of implied warranties for what essentially amounts to misuse of a product expressly sold by Zoetis for limited, nonfood purposes, particularly when Zoetis undisputedly informed Heritage, as the purchaser, of the risks of, and limited uses for, Lascadoil. Procedurally, Zoetis and Heritage were both commercial entities, and plaintiffs identify no inequities in their respective bargaining power. The agreement between Zoetis and Heritage was neither substantively nor procedurally unconscionable at the time it was made. See *Davis*, 271 Mich App at 80. Accordingly, the disclaimer is valid. And plaintiffs, as remote purchasers cannot have acquired any greater rights against Zoetis than those possessed by Heritage.[5] See *Vanalstine*, 326 Mich App at 651; *Heritage Resources, Inc*, 284 Mich App at 641. See also *Buettner v RW Martin & Sons, Inc*, 47 F3d 116, 119 (CA 4, 1995) (rejecting the argument that enforcement of a disclaimer against a third-party end user would be unconscionable when it was "not unconscionable as to the parties" to the contract). Indeed, even the events after Zoetis's disclaimer—i.e., subsequent actors' decisions to ignore the safety information provided by Zoetis and to sell Lascadoil for uses other than its intended purpose, resulting in harm to plaintiffs—do not support plaintiffs' unconscionability argument. There is nothing conscience shocking, inequitable, or dishonest in allowing Zoetis to disclaim an implied warranty for what amounts to the misuse of a product that Zoetis expressly sold for limited purposes and with safety warnings regarding those limited uses. See *Clark*, 268 Mich App at 143-144. Plaintiffs' unconscionability argument lacks merit.

_____

[5] On appeal, plaintiffs rely heavily on *Martin v Joseph Harris Co, Inc*, 767 F2d 296, 301 (CA 6, 1985), overruled in part on other grounds as recognized by *In re Grand Jury 89-4-72*, 932 F2d 481, 487 (CA 6, 1991). However, *Martin* is distinguishable in at least two key ways. First, *Martin* involved contracts directly between farmers and a seed producer and distributor, meaning that, unlike the current case, the farmers (who were "relatively small farmers" with no realistic alternatives) were directly negotiating with the producer and, therefore, the farmers' rights were not restricted by the agreement of an intermediary, such as Heritage. See *Vanalstine*, 326 Mich App at 651; *Heritage Resources, Inc*, 284 Mich App at 641. In contrast, in the current case, assessing unconscionability at the time the contract was made involves consideration of the time Zoetis and Heritage entered their agreement. Second, the finding of unconscionability in *Martin* involved a latent defect in seeds (black leg disease) and the producer's failure to adequately convey information about its decision to discontinue a hot water treatment (which would have prevented black leg disease in the seeds). See *Martin*, 767 F2d at 301. In contrast, in this case, Zoetis undisputedly conveyed the risks and limited uses of Lascadoil to Heritage (and Shur-Green), defeating any implied warranty claim by Heritage and, by extension, plaintiffs. See *Vanalstine*, 326 Mich App at 651; *Heritage Resources, Inc*, 284 Mich App at 641. *Martin* is inapposite.

Overall, plaintiffs' claim for breach of implied warranty is legally insufficient, and the trial court did not abuse its discretion by denying plaintiffs' motion to amend as futile.

Affirmed.

/s/ Michael F. Gadola
/s/ Brock A. Swartzle
/s/ Thomas C. Cameron