*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

GLOBAL SIGNAL ACQUISITIONS IV, LLC, and
AMERICAN TOWER ASSET SUB II, LLC,

UNPUBLISHED
July 18, 2024

Plaintiffs/Counterdefendants-
Appellees,

v

No. 365908
Wayne Circuit Court
LC Nos. 22-006841-CB;
22-006929-CB

ADAMO CONSTRUCTION, LLC,

Defendant/Counterplaintiff/Third-
Party Plaintiff-Appellant,

and

DETROIT SMSA LIMITED PARTNERSHIP,
NEXTEL WEST CORP., METROPCS MICHIGAN,
INC., T-MOBILE CENTRAL, LLC, US BANK,
N.A., and ALL OTHERS WHO MAY CLAIM AN
INTEREST IN REAL PROPERTY LOCATED AT
17737 FENKELL, DETROIT, MI,

Third-Party Defendants-Appellees.

Before: LETICA, P.J., and BOONSTRA and MARIANI, JJ.

PER CURIAM.

Defendant/counterplaintiff/third-party plaintiff, Adamo Construction, LLC (Adamo), appeals by right the trial court's order denying its motion for summary disposition and granting summary disposition in favor of plaintiff/counterdefendant Global Signal Acquisitions IV, LLC (GSA), plaintiff/counterdefendant American Tower Asset Sub II, LLC (American Tower), and third-party defendant Detroit SMSA Limited Partnership (Detroit SMSA). We affirm in part, reverse in part, and remand for further proceedings.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Western Properties Corp. (Western) formerly was the owner of a parcel of real property located at 17707 Fenkell Avenue in Detroit, upon which a commercial building is situated, as well as 17737 Fenkell, upon which a parking lot for the building is located. A cell tower and related equipment at issue in this case are apparently situated on 17737 Fenkell. In 1990, Western leased a portion of each property to Detroit SMSA, authorizing Detroit SMSA to erect an antenna structure and associated equipment as was necessary to conduct its telecommunication transmission business. The lease called for an initial five-year term, with an option to extend for several additional five-year terms. The lease also required Detroit SMSA to remove "all of its improvements, personal property, and fixtures, (including electrical cables and racking)," within 90 days after termination of the lease.

In the following years, Detroit SMSA subleased to Southern Towers, which in turn subleased to third-party defendant MetroPCS Michigan, Inc (MetroPCS). Third-party defendant T-Mobile Central, LLC (T-Mobile), is purportedly the parent company of MetroPCS. Southern Towers later assigned its interest to American Tower, and American Tower mortgaged that interest. That mortgage is now held by third-party defendant US Bank, N.A. (US Bank). Separately, Western entered a communication site lease agreement with third-party defendant Nextel West Corp., (Nextel), allowing Nextel to connect equipment to the existing cell tower erected by Detroit SMSA.[1]

In 2008, Western conveyed to GSA "an exclusive, perpetual easement for the use of a portion of [Western's] Property, that portion being described as a 523 square feet parcel within Grantor's Property," apparently referring to the area on which the cell tower and related equipment is located (the easement). In pertinent part, paragraph 3 of the grant of easement states, "The Easement Area shall be used only for constructing, maintaining and operating a wireless communications facility and uses incidental thereto for GSA IV's use and the use of its lessees, licensees, and/or sub-easement holders (the 'Permitted Use')." A paragraph titled "Assignment of Lease Agreement" was designated as intentionally deleted. At the same time the grant of easement was executed, Western also assigned to GSA its interests in the 1990 Detroit SMSA lease and the 2003 Nextel lease. The grant of easement and both assignments were recorded with the Register of Deeds.

Several years later, in 2014, Western sold both Fenkell properties to 1st Priority Physical Therapy, LLC (1st Priority PT). The covenant deed, however, was granted

> subject to easements, building and use restrictions and interests of record and excluding, but subject to, the Cell-Tower Interests. The Cell-Tower Interests include (i) the real estate, improvements and personal property relating to the cell-tower located on the Property, including without limitation the cell-tower, equipment, fixtures, fences, building and various other improvements, structures

---

[1] An apparent affiliate or successor of Nextel opted not to renew its lease in 2015, resulting in the termination of that lease in March 2018.

and personal property; (ii) the legal interests relating to the cell-tower, including without limitation the Grant of Easement by Western Properties Corp to Global Signal Acquisitions IV LLC dated June 2, 2008; the assignments of Lessor's interests in various leases to Global Signal Acquisitions IV LLC dated June 2, 2008; and all the related easements, leaseholds and other interests; and (iii) unrestricted access to the related rooms and facilities located in the basement of the Premises.

Although there was some disagreement as to who bore responsibility for paying property taxes after the sale to 1st Priority PT, it is undisputed that the property taxes went unpaid. T-Mobile redeemed 17707 Fenkell from tax forfeiture concerning 2014 and 2015 taxes in 2017 and 2018, respectively, and filed liens against that property in the amount of the tax payments. The Wayne County Treasurer recorded a certificate of forfeiture concerning 17737 Fenkell in 2017. The Wayne County Treasurer subsequently petitioned the Wayne Circuit Court for foreclosure on the basis of the delinquent taxes, resulting in the entry of a judgment of foreclosure containing the following provision:

> (e) All existing recorded and unrecorded interests in the property are extinguished, except a visible or recorded easement or right-of-way, private deed restrictions, or restrictions or other governmental interests, imposed pursuant to the Natural Resources and Environmental Protection Act, 1994 PA 451, MCL 324.101 to 324.90106, if all the forfeited delinquent taxes, interest, penalties, and fees are not paid to the County Treasurer within 21 days of the entry of this judgment[.]

It is undisputed that the delinquent taxes were not paid during the redemption period and that fee simple title in 17737 Fenkell vested in the Wayne County Treasurer. The Wayne County Treasurer conveyed 17737 Fenkell to Cres Fund I, LLC (Cres Fund) in 2018 via a quit claim deed. Cres Fund conveyed the property to Adamo via warranty deed in 2021.

In 2022, Adamo sent a demand letter to GSA's parent company and American Tower explaining the history of 17737 Fenkell and advising them to contact Adamo's counsel to negotiate a new cell tower lease and easement agreement. Rather than negotiating with Adamo, GSA and American Tower both filed suit seeking to quiet title; they also requested (1) declaratory relief confirming that the easement survived the foreclosure and remains binding on Adamo; (2) specific enforcement of the terms of the easement, which purportedly prohibited Adamo from taking any action that would adversely affect the easement area and permitted use; and (3) injunctive relief barring Adamo from interfering with GSA's rights, and the rights of its lessees, under the easement. Adamo filed counterclaims and a third-party complaint asserting numerous theories to challenge the validity of the interests held by each party.

Motions for summary disposition were filed by Adamo, GSA, American Tower, and Detroit SMSA. The trial court decided the competing motions without oral argument and issued a written opinion holding that (1) the easement granted to GSA was not extinguished by the judicial tax foreclosure; (2) the leases and subleases held by various parties likewise survived the judicial tax foreclosure because the purpose of the easement was to allow GSA and its lessees to operate a wireless communication facility; and (3) the cell tower was not a fixture. On the basis of these conclusions, the trial court granted summary disposition in favor of GSA, American Tower, and Detroit SMSA, and denied Adamo's competing dispositive motion. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *Aldrich v Sugar Springs Prop Owners Ass'n, Inc*, 345 Mich App 181, 185; 4 NW3d 751 (2023). "Summary disposition is appropriate pursuant to MCR 2.116(C)(10) where there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." *Id*. at 186 (quotation marks and citation omitted). "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted). We review de novo the interpretation of legal instruments such as a grant of easement or lease agreement, *Smith v Straughn*, 331 Mich App 209, 214; 952 NW2d 521 (2020), and questions of statutory interpretation, *Woodman v Dep't of Corrections*, 511 Mich 427, 440; 999 NW2d 463 (2023).

## III. EASEMENT

Adamo argues that the trial court erred by holding that the easement was excepted from the effects of a judicial tax foreclosure under MCL 211.78k(5)(e). We disagree.

When real property taxes go unpaid, the General Property Tax Act (GPTA), MCL 211.1 *et seq*., provides a method for the government to recover the past due taxes, penalties, interest, and fees. *Rafaeli, LLC v Oakland Co*, 505 Mich 429, 441-442; 952 NW2d 434 (2020). "Under the current process, tax-delinquent properties are forfeited to the county treasurers; foreclosed on after a judicial foreclosure hearing; and, if not timely redeemed, sold at a public auction." *Id*. at 442. MCL 211.78k(5) identifies certain provisions that must be included in a judgment of foreclosure entered pursuant to this scheme, including a statement specifying "[t]hat all existing recorded and unrecorded interests in that property are extinguished, except a visible or recorded easement" and other enumerated interests. MCL 211.78k(5)(e). Adamo argues that this provision is inapplicable to the grant of easement in favor of GSA, because that grant was more akin to a conveyance of a fee interest than an easement. In support of this theory, Adamo primarily relies on the fact that the grant purported to convey an exclusive and transferable interest. We disagree.

"An easement is a limited property interest; it is the right to use the land burdened by the easement for a specific purpose." *Smith*, 331 Mich App at 215. The owner of the servient estate retains the right to use the servient estate "for any purpose not unreasonably inconsistent with the rights of the easement holder." *Id*. at 216. The easement holder's use, on the other hand, is limited and dictated by the purpose for which the easement was granted. *Id*. at 215. Such use "must impose as little burden as possible to the fee owner of the land, but the easement holder nevertheless enjoys all such rights as are incident or necessary to the reasonable and proper enjoyment of the easement." *Id*. (quotation marks and citation omitted). When an easement grant is unambiguous, it must be enforced as written. *Id*. at 216. Courts may look to extrinsic evidence to evaluate the scope of an easement only when the written instrument is ambiguous. *Id*.

As Adamo points out, exclusive easements are generally disfavored. See *Penrose v McCullough*, 308 Mich App 145, 152; 862 NW2d 674 (2014). "Nevertheless, if parties agree to

do so, exclusive easements can be created." *Id*. at 151-152, quoting *Latham v Garner*, 105 Idaho 854, 856; 673 P2d 1048 (1983). When the grantor in *Penrose* executed a deed that conveyed an "exclusive perpetual easement . . . for parking, storage, a right of way, and for sanitary and other sewer and water line and other utilities," *Penrose*, 308 Mich App at 149 (emphasis omitted), this Court concluded that the conveyance provided an exclusive easement, and only the grantees or later owners of the dominant estate could use the easement area, *id*. at 152.

In this case, the grant of easement contained similar exclusivity language to the grant in *Penrose*, stating, "Grantor grants and conveys unto GSA IV, its successors and assigns, forever, an exclusive perpetual easement for the use of" the easement area. And as was true in *Penrose*, there is simply no ambiguity in the use of the word "exclusive," which expresses Western's intent to convey an easement that was exactly as described—exclusive. That intent is underscored by the fact that the very same paragraph of the document also conveyed "a non-exclusive, perpetual right-of-way for ingress and egress," making it apparent that the earlier use of the word "exclusive" was intentional and significant. Because Michigan recognizes exclusive easements when there is a clear intent to create such an interest, the mere fact that GSA had the right to use the easement area to Adamo's exclusion does not render the easement invalid or otherwise affect its ability to survive judicial forfeiture. *Id*. at 152.

Adamo also takes issue with the use of the easement area by parties other than GSA when easements in gross are, according to Adamo, "generally non-transferable." But easements in gross that are commercial in nature are generally alienable. See *Johnston v Mich Consol Gas Co*, 337 Mich 572; 60 NW2d 464 (1953). Indeed, as this Court stated more recently, "An easement in gross is an alienable, and thus transferable, property right." *Heydon v MediaOne*, 275 Mich App 267, 274; 739 NW2d 373 (2007). In any event, there was no evidence presented that GSA has attempted to transfer the easement to anyone; rather, it has merely continued leasing the easement area to third parties, consistent with its rights under the grant of easement.

To the extent Adamo also contends that an exclusive easement could not have been granted while third parties continued to have leasehold interests in the same property, we also disagree, for two reasons. First, any interference in the existing leasehold interest arising from the grant of easement would potentially cause harm to the lessees, not Adamo. Consequently, a challenge to the easement on that ground is not properly raised by Adamo. See *Pontiac Police & Fire Retiree Prefunded Group Health & Ins Trust Bd of Trustees v Pontiac*, 309 Mich App 611, 622; 873 NW2d 783 (2015) ("But plaintiffs must assert their own legal rights and cannot rest their claims to relief on the rights or interests of third parties."). The lessees have raised no objection to the easement and, in fact, support its existence. This is presumably because of the second reason Adamo's position lacks merit: the leases were assigned to and assumed by GSA simultaneously with the grant of easement. As a result of these simultaneous transactions, there was no interference with the leasehold interests or any inconsistency between those interests and the easement conveyed to GSA.

Because Adamo's arguments regarding the validity of the easement lack merit, the trial court did not err by concluding that the easement was valid and protected pursuant to MCL 211.78k(5)(e). The easement was clearly visible inasmuch as the cell tower and ground-level equipment in the easement area are enclosed by a fence with a no-trespassing sign and secured with padlocks bearing American Tower's name and contact information. The easement

was also indisputably recorded in 2008, long before the judicial foreclosure. The trial court correctly held that the statutory exception excluding a "visible or recorded easement" from the interests extinguished in a judicial tax foreclosure, MCL 211.78k(5)(e), applied to GSA's easement.

## IV. LEASEHOLD INTERESTS

Adamo also argues that the trial court erred by holding that the leasehold interests of other parties in the foreclosed property survived the judicial foreclosure. We agree.

This Court's goal in statutory interpretation is to discern and give effect to the Legislature's intent. *Sunrise Resort Ass'n, Inc v Cheboygan Co Rd Comm*, 511 Mich 325, 333; 999 NW2d 423 (2023). Courts must focus on the express language of the statute, "which offers the most reliable evidence of the Legislature's intent." *Stirling v Leelanau*, 511 Mich 25, 30; 993 NW2d 196 (2023). Proper statutory interpretation requires this Court to "give effect to every word, phrase, and clause in a statute, and consider both the plain meaning of the critical word or phrase as well as its placement and purpose in the statutory scheme." *Wilcox v Wheatley*, 342 Mich App 551, 557; 995 NW2d 594 (2022) (quotation marks and citation omitted). "When a statute's language is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written." *Sunrise Resorts Ass'n*, 511 Mich at 334 (quotation marks and citation omitted).

As noted earlier, subject to exceptions identified in MCL 211.78k, a properly conducted judicial tax foreclosure, followed by a failure to redeem, extinguishes "all existing recorded and unrecorded interests in that property." MCL 211.78k(5)(e). A lease creates an interest in real property. *Spartan Stores, Inc v Grand Rapids*, 307 Mich App 565, 575; 861 NW2d 347 (2014). The only leasehold interests excepted under MCL 211.78k(5)(e) concern certain interests related to recorded oil or gas leases. Nonetheless, the trial court held that the various leases and subleases at issue in this case were not extinguished by the tax foreclosure because they were incorporated in and essentially protected by GSA's easement, given that the purpose of the easement was to construct, maintain, and operate a telecommunications facility for use by GSA and its lessees. Based on the plain language of MCL 211.78k, the trial court erred by doing so.

MCL 211.78k(5)(e) requires the circuit court entering a judgment of foreclosure under the GPTA to declare "[t]hat *all* recorded and unrecorded interests in the property are extinguished," except those specified in the statute. (Emphasis added). As this Court has observed with respect to other statutes, the Legislature's use of the word "all" signifies the broadest possible classification. *Reed-Pratt v Detroit City Clerk*, 339 Mich App 510, 518; 984 NW2d 794 (2021). "In its ordinary and natural meaning, the word 'all' leaves no room for exceptions." *Id.*, quoting *Heritage Resources, Inc v Caterpillar Fin Servs Corp*, 284 Mich App 617, 642; 774 NW2d 332 (2009). The Legislature's choice of word indicates its intent to extinguish every sort of interest in the foreclosed property not explicitly excepted. Although a visible or recorded easement survives judicial tax foreclosure under MCL 211.78k(5)(e), the exception for leases is limited to "interests of a lessee or an assignee of a lessee under a recorded oil or gas lease." All other interests in the property, which necessarily include interests in leases other than a recorded oil or gas lease, are

extinguished under the unambiguous language of the statute.[2]  See *Spartan Stores*, 307 Mich App at 575 (recognizing leases as interests in real property).

Notwithstanding the plain language of MCL 211.78k(5)(e), the trial court opined that the leases and subleases of the tower space, now encompassed within the easement area, were not extinguished because leasing the cell tower was an express purpose of the easement, and it would be illogical to conclude that the easement survived the tax foreclosure while the interests that related to its purpose did not.  The purpose for an easement admittedly controls its scope, *Blackhawk Dev Corp v Village of Dexter*, 473 Mich 33, 41; 700 NW2d 364 (2005), but there is no legal support for allowing that purpose to negate the operation of an unambiguous statute such as MCL 211.78k(5)(e).  Moreover, the trial court's reasoning is at odds with the law of assignments.  Assignees stand in the shoes of the assignor and possess the same rights.  *Jawad A Shah, MD, PC v State Farm Mut Auto Ins Co*, 324 Mich App 182, 204; 920 NW2d 148 (2018).  Consequently, an assignee cannot obtain any greater rights than were possessed by the assignor.  *Id*.  Had Western continued to hold the leases rather than assigning them to GSA in tandem with the grant of easement, there would be no question that the leases would be extinguished by operation of law under the GPTA.  Because GSA's assignor could not have shielded the leases from the effects of the judicial tax foreclosure, neither could GSA through its easement.  We therefore reverse the trial court's holding regarding this issue and hold that the leases were extinguished by operation of law upon the entry of a judgment of foreclosure.  See MCL 211.78k(5)(e).

## V.  FIXTURE

Adamo also argues that the cell tower was a fixture, ownership of which passed to Adamo when it acquired title to 17737 Fenkell.  We disagree.

Personal property will be deemed a fixture to real property if three criteria exist: "[First], annexation to the realty, either actual or constructive; second, adaptation or application to the use or purpose to which that part of the realty to which it is connected is appropriated; and third, intention to make the article a permanent accession to the freehold."  *Wayne Co v William G Britton & Virginia M Britton Trust*, 454 Mich 608, 615, 620; 563 NW2d 674 (1997) (quotation marks and citation omitted).  If personal property constitutes a fixture, it is treated as part of the real property, such that title to the fixture passes to the purchaser of the real property, following a tax foreclosure or otherwise.  *Ottaco, Inc v Gauze*, 226 Mich App 646, 650-651; 574 NW2d 393 (1997).

We conclude that the trial court did not err by holding that the cell tower failed the third element of the fixture test, i.e., "intention to make the article a permanent accession to the freehold."  *Wayne Co*, 454 Mich at 615 (quotation marks and citation omitted).  The intention of the annexor is assessed objectively from visible facts.  *Id*. at 619.  "Intent may be inferred from

---

[2] We note that little attention was given to US Bank's mortgage in the proceedings below.  But as an interest in the real estate for which no statutory exception is provided, see *In re $55,336.17 Surplus Funds*, 319 Mich App 501, 507; 902 NW2d 422 (2017) (recognizing a mortgage is an interest in real property given as security for performance of an obligation), it too was extinguished by the plain language of MCL 211.78k(5)(e).

the nature of the article affixed, the purpose for which it was affixed, and the manner of annexation." *Id.* Additionally, as the Supreme Court noted long ago: "If . . . property is part of the realty, it became so at the time it was annexed thereto." *Lord v Detroit Savings Bank*, 132 Mich 510, 511; 93 NW 1063 (1903).

The cell tower was constructed by Detroit SMSA under its 1990 lease. Paragraph 1(b) of that lease states, "Landlord hereby further grants unto Tenant the right to lease a portion of the Property described on <u>Exhibit A</u>, upon which Tenant may erect its antenna structure upon which equipment and fixtures which Tenant deems necessary to conduct its telecommunication transmission business (such antennas, transmission lines and related equipment and fixtures shall at all times be the property of the Tenant)." Paragraph 9 further states:

> <u>Removal of Tenant's Property at End of Lease</u>. Tenant, upon termination of this Lease, shall within ninety (90) days after the termination of this Lease, remove all of its improvements, personal property, and fixtures, (including electrical cables and racking), and shall restore the Property substantially to its original condition, at Tenant's sole expense, reasonable wear and tear excepted, provided Tenant will not be required to remove any heating, ventilating or air condition equipment, demising walls, concrete slabs, sidewalks or foundation. . . . All cost and expenses incurred by Landlord in connection with repairing or restoring the Premises to the condition called for herein together with the cost, if any, of removing from the Premises any property Tenant left therein shall be invoiced to Tenant and shall be payable as additional rental within twenty-one (21) days after the receipt of invoice.

The plain language of these provisions expressed an intent to keep the structure built by Detroit SMSA separate from the land so that it retained its status as Detroit SMSA's personal property, rather than a permanent accession to the leased property. This intent is further supported by the recorded memorandum of the lease, which states that Detroit SMSA would be afforded an easement as was necessary "to erect or take down its antenna structure," and that all Detroit SMSA's "improvements (including fixtures) added to the leased premises by Tenant shall be Tenant's property and shall be removed by Tenant within ninety days after termination of the Lease."

Adamo maintains that the parties' intended to establish the cell tower as a fixture that ran with the land because "[i]t is sufficient if the item is intended to remain where affixed until worn out, until the purpose to which the realty is devoted is accomplished or until the item is superseded by another item more suitable for the purpose." *Mich Nat'l Bank v Lansing*, 96 Mich App 551; 293 NW2d 626 (1980).[3] Notably, this Court's analysis of the nature of the banking items involved in *Mich Nat'l Bank* was extremely fact-driven:

---

[3] This Court's decision in *Mich Nat'l Bank* is not strictly binding because it was decided before November 1, 1990, but may be persuasive. *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018).

All four items are physically annexed to the realty. The night depository equipment, drive-up window equipment and the vault doors are all cemented into place. Once installed, they are integrated with and become part of the wall in which they are mounted. The remote transaction units are also physically integrated with the land and the buildings. Such a unit consists of a roof-type canopy supported by pillars which extends from the building wall or roof over the customer unit. The customer unit is mounted with steel bolts to a specially constructed concrete island. A pneumatic tube system runs either up into the canopy or down into the ground and then into the building.

Furthermore, each item is adapted to the use of the realty. In fact, not only is the present use of these buildings dependent on the presence of these items, none of these items can be used unless they are affixed to a building or land. [*Id*. at 554-555.]

If anything, *Mich Nat'l Bank* supports the conclusion that the cell tower at issue in this case was not intended to be a fixture. In this case, the cell tower was not made an integral part of the parking lot or building situated on the neighboring property. Instead, it was erected behind and unattached to the building and secured in place by large nuts and bolts, rather than a more permanent method of attachment. Photographs of the cell tower demonstrate that it stood not substantially taller than nearby power lines. Consequently, it could be removed more readily than larger cell towers constructed in more rural areas. Even though *Mich Nat'l Bank* recognized that the permanence intended "is not equated with perpetuity," *id*. at 554, that case still involved significantly more evidence of permanence than is at issue here. Considering the totality of the circumstances, the trial court did not err by concluding that there was no intention to make the cell tower a permanent accession to the property.[4] *Smith*, 331 Mich App at 214.

Affirmed in part, reversed in part, and remanded for further proceedings. We do not retain jurisdiction.

/s/ Anica Letica
/s/ Mark T. Boonstra
/s/ Philip P. Mariani

---

[4] Because we affirm the trial court's holding regarding the third factor of *Britton Trust*, we need not address the parties' arguments concerning the other factors.